## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

MICHAEL KASCSAK,

  *Plaintiff,*

v.

          Case No.: 1:23-cv-1373-DII

EXPEDIA, INC., AND MICHAEL DAVIS VELASCO,  **JURY TRIAL DEMANDED**

  *Defendants.*

---

## PLAINTIFF'S FIRST AMENDED COMPLAINT

---

American companies are free to evaluate potential hires using countless factors but cannot use immutable characteristics like race and sex[1]—yet that's exactly what happened when Plaintiff Michael Kascsak interviewed this past spring for an executive level position based in Austin, Texas with Defendant Expedia, Inc. Like other major American corporations, Expedia has embraced illegal practices, quotas, and more insidious means to "diversify" its workplace at the expense of merit. This includes publicly advertised intentions to make Expedia's hiring (and ultimately workforce) at least 50% non-male and 25% racial minority—the latter being a goal Expedia missed in 2022, especially amongst leadership-level hiring, that it promised to double down on this year. Sometimes, "nondiverse" candidates like Kascsak (who is white, male, straight, and forty-nine years old) can overcome such discrimination, and he was close: As Expedia remarked in writing,

---

[1] As defined by both the pertinent statutes and the Supreme Court, "race" includes color, national origin, ethnicity, and race. *Ricci v. DeStefano*, 557 U.S. 557, 581-82 (2009). "Sex" includes sex and sexual orientation. *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020).

he was the Company's **"top pick"** amongst the job candidates—and he even received an oral job offer in May 2023.

But at the direction of Expedia's Chief People, Inclusion, and Diversity Officer, Defendant Michael Davis Velasco, the Company prioritized "diversity" and declined to hire Kascsak despite his exceptional qualifications. Expedia never followed up with a written offer, blamed the months-long delay on an internal reorganization while reopening the job search and interviewing other applicants, and then in August invited him to New York City to meet specifically with Davis Velasco (again) only for Davis Velasco to back out at the last minute. Instead, Kascsak met with Allison Allen, Expedia's Senior Vice President of Talent Acquisition, who conveyed to Kascsak that the Company's bizarre handling of his candidacy was due to Davis Velasco wanting a diverse candidate for the role. Kascsak never had the chance to overcome this tokenization and show Davis Velasco that he was the right person for the job either, because Davis Velasco abruptly canceled their rescheduled meeting, too. Shortly thereafter, the Company communicated what was now obvious: Kascsak would not be getting the role, as Expedia decided to go in a "safer" direction and hire a "diverse" last-minute internal referral—almost half a year after extending the high-compensation, executive level job offer to Kascsak.

In America, "[e]quality of opportunity is fundamental to who we are, and to who we aspire to be, as a nation." *Lindsley v. TRT Holdings, Inc.*, 984 F.3d 460, 464 (5th Cir. 2021) (discussing Title VII). Antidiscrimination law exists to ensure the most deserving is hired, like Kascsak here. That doesn't always happen, but it does *not* permit companies like Expedia to illegally rebuke civil rights law by elevating some candidates while harming others based on immutable traits. Such illegal practices at Expedia precluded Michael Kascsak from fair consideration and, ultimately, employment. Accordingly, Kascsak files this suit for relief.

## PARTIES

1.     **Plaintiff Michael Kascsak** resides in Austin, Texas. He lives with his wife of eight years, and their eight-year-old daughter. He is the sole earner for his family. Declaration, Ex. A at 1-2. Kascsak is white, male, heterosexual, and forty-nine-years old.

2.     Kascsak is a senior corporate executive who specializes in talent acquisition and human resources, primarily for major American corporations and most recently in the technology space. His experience spans more than two decades, with approximately fifteen years at the executive level. Declaration, Ex. A at 2. He worked as an executive at (a) Capital One, as Director of Financial Services Recruitment from 2010-2014, (b) CBRE, as Head of Talent Acquisitions (Americas) from 2015-2017, (c) PayPal, as Head of Global Technical Talent Acquisition and then Head of Talent Acquisition (Americas) from 2017 until 2020, and (d) Google, as the Head of Recruitment Process Outsourcing for Software, North America, and then the North American Head of Software Engineer Sourcing from 2020 until 2023. Declaration, Ex. A at 2-4. Kascsak was an outstanding talent acquisition executive, receiving accolades from his past employers for his significant achievements. Declaration, Ex. A at 2-4. He has never been terminated for cause but is now unemployed after Google laid off a substantial portion of its workforce in early 2023. *See* Sundar Pinchai, CEO of Google and Alphabet, *A difficult decision to set us up for the future*, Google, January 20, 2023, https://perma.cc/MVX4-YZKD.

3.     **Defendant Expedia, Inc. ("Expedia")** is a Washington corporation with its principal place of business in Washington.

4.     Expedia currently operates one of the world's largest online travel agencies, providing travelers with instantaneous research, planning, and booking information.

5.      **Defendant Michael Davis Velasco ("Davis Velasco")** is the Chief People, Inclusion, and Diversity Officer at Expedia. He is based out of the Company's New York office and, on information and belief, resides in New York.

## JURISDICTION AND VENUE

6.      This Complaint arises under 42 U.S.C. § 1981 (race discrimination in contracting), 42 U.S.C. § 2000e et seq. (Title VII) (race and sex discrimination in employment/hiring), and under Chapter 21 of the Texas Labor Code § 21.051 (race and sex discrimination in employment/hiring). Accordingly, this Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 (federal question) and 1343 (civil rights). This Court has supplemental jurisdiction over Plaintiff's Texas Commission on Human Rights Act ("TCHRA") claims, Texas Labor Code § 21.051, pursuant to 28 U.S.C. § 1367.

7.      Kascsak has appropriately exhausted his administrative remedies as required by Title VII and the TCHRA by filing a discrimination complaint with the Texas Workers Commission (dual-filed with EEOC) and receiving "right to sue" letters on both the State and federal claims. Right to Sue Letters, Ex. Q. This Complaint is timely filed in accordance with notice of those letters. There is not an administrative exhaustion requirement to pursue the § 1981 claim.

8.      This Court has specific personal jurisdiction over Defendants Expedia and Davis Velasco. In the Fifth Circuit, courts "must construe all disputed facts in the plaintiff's favor" when analyzing personal jurisdiction. *Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235, 241 (5th Cir. 2008). The party seeking to establish jurisdiction must only present a *prima facie* case, *id.*, which is analyzed by "accept[ing] the plaintiff's uncontroverted allegations as true and resolv[ing] all conflicts of [jurisdictional] facts contained in the parties' affidavits and other

documentation in the plaintiff's favor." *Jones v. Artists Rights Enf't Corp.*, No. 19-30374, 2 (5th Cir. 2019) (per curiam) (cleaned up). Kascsak clearly meets the burden to sue both Defendants in this Court.

9.     This Court has specific personal jurisdiction over Defendant Expedia. Due process requires that the Defendants be given "fair warning" that their actions subject them to a particular State's jurisdiction. *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 473 (1984). That threshold is met if (a) a defendant purposefully avails his activities at residents of the forum State, and (b) the litigation addresses harm from those activities. *Id.* When an out of State company recruits a Texas resident for employment and that effort causes harm—like Expedia did to Kascsak—the *Burger King* requirements are satisfied. *See Astorga v. Connleaf. Inc.*, 962 F. Supp. 93, 95 (W.D. Tex. 1996); *Gonsalez Moreno v. Milk Train, Inc.*, 182 F. Supp. 2d 590, 594 (W.D. Tex. 2002) (citing TEX. CIV. PRAC. REM. CODE ANN. § 17.042(3)).

10.     This Court also has specific personal jurisdiction over Defendants Expedia and Davis Velasco because their liability arises from Kascsak's *intentional* § 1981 racial discrimination claim. "Intentional conduct designed to cause harm" in Texas is, "indeed, a basis for finding minimum contacts" justifying jurisdiction by the State. *Amoco Chemical Co. v. Tex Tin Corp.*, 925 F. Supp. 1192, 1200 (S.D. Tex. 1996) (citing *Calder v. Jones*, 465 U.S. 783, 787-90 (1984)). Kascsak sufficiently pleads that both Expedia and Davis Velasco violated § 1981, *infra* III & IV, and as a result, Kascsak plausibly alleges they each committed an intentional tort. *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1013-14 (2020) (analyzing § 1981 under tort law); *Markey v. Tenneco Oil Co.*, 635 F.2d at 497, 498 n.1 (citing *Crawford v. Western Elec. Co.*, 614 F.2d 1300, 1309 (5th Cir. 1980)) (§ 1981 requires intent). In

the Fifth Circuit, a well pleaded intentional tort alone confers personal jurisdiction. *See Lewis v. Fresne*, 252 F.3d 352, 359 (5th Cir. 2001).

11.     Further, even a single "act done outside the state that has consequences [] within the state" confers personal jurisdiction "if the effects are seriously harmful and were intended or highly likely to follow from the nonresident defendant's conduct." *Guidry v. U.S. Tobacco Co., Inc.*, 188 F.3d 619, 628 (5th Cir. 1999); *Brown v. Flowers Indus.*, 688 F.2d 328, 332-33 (5th Cir. 1982) (holding a single telephone call initiated by defendant conferred personal jurisdiction). Davis Velasco's relevant conduct for specific jurisdiction here is his directive to look for a more diverse candidate and not hire Kascsak, a white and male Texas resident. Declaration, Ex. A at 10-12; Christensen Emails, Ex. I at 1. Kascsak's employment contract would have been based in Texas and required performance there, too. *See Moncrief Oil Int'l Inc. v. OAO Gazprom*, 481 F.3d 309, 312 (5th Cir. 2007) (finding no minimum contacts where "the contract did not require performance in Texas, and the contract is centered outside of Texas"); Declaration, Ex. A at 4-5. In the Fifth Circuit, Davis Velasco's (and thus Expedia's) "single, substantial act directed towards [Texas]"—illegal discrimination against Kascsak—substantiates specific jurisdiction, *Command-Aire Corp. v. Ontario Mech. Sales and Serv., Inc.*, 963 F.2d 90, 94 (5th Cir. 1992), even though "all of the alleged conduct" by Davis Velasco occurred (presumably) in New York, where he's based. *Pension Advisory Grp., Ltd. v. Country Life Ins. Co.*, 771 F. Supp. 2d 680, 695 (S.D. Tex. 2011).

12.     Finally, the fiduciary shield doctrine does not shield Davis Velasco from specific personal jurisdiction in Texas. This doctrine generally "holds that an individual's transaction of business within" Texas "solely as a corporate officer does not create personal jurisdiction over that individual though the [S]tate has in personam jurisdiction over the corporation." *Stuart v.*

*Spademan*, 772 F.2d 1185, 1197 (5th Cir. 1985). But that protection is absolved when the corporate officer is accused of an intentional tort, even if it is carried out in his official capacity with the corporation. *See General Retail Servs., Inc. v. Wireless Toyz Franchise*, LLC, 255 Fed. App'x 775, 794-95 (5th Cir. 2007); *Cerbone v. Farb*, 225 S.W.3d 764, 769 (Tex. App. 2007).

13.     Separately, the fiduciary shield also does not apply when a corporate officer's "personal interests motivate his actions," like with Davis Velasco here. *Lewis*, 252 F.3d at 359 n. 6 (quoting *Darovec Mktg. Grp., Inc. v. Bio–Genics, Inc.*, 42 F.Supp.2d 810, 819 (N.D. Ill. 1999)). Davis Velasco is an openly zealous activist for diversity, equity, and inclusion: He proudly writes on his LinkedIn profile that he is *personally* "fortunate" to work at Expedia because he can create more "inclusive" and "equitable" workplaces, Davis Velasco LinkedIn, Ex. C at 2, and that "there are *moral* reasons to focus on diversity" that he believes in separate from Expedia's business interests. Brooke Masters, *Hermès shoots to top of FT diversity ranking with emphasis on 'belonging'*, FINANCIAL TIMES (Nov. 16, 2021) https://tinyurl.com/ysuhfzkf (emphasis added). This demonstrates a distinct personal motivation for Davis Velasco's illegal actions aligned with Expedia's own diversity priorities. *Lewis*, 252 F.3d at 259 n.6.

14.     Finally, the fiduciary shield doctrine only applies "to the exercise of general jurisdiction, not specific" jurisdiction as Texas has over Davis Velasco here. *Barnhill v. Automated Shrimp Corp.*, 222 S.W.3d 756, 768 (Tex. App. 2007); *Bray v. Cadle Co.*, 2010 WL 4053794, *13 n. 10 (S.D. Tex. 2010) (citing *Barnhill*); *Cerbone*, 225 S.W.3d at 769.

15.     Accordingly, this Court has personal jurisdiction over both Davis Velasco and Expedia.

16.     Davis Velasco is a valid defendant under § 1981 because "[d]istrict courts within the Fifth Circuit generally . . . recognize individual liability under § 1981 for supervisors who

exercise control over employment decisions and were personally involved in the complained-of conduct." *Thomas v. Link Staffing*, 2019 WL 486875, at *4 (S.D. Tex. 2019); *see also Cardenas v. Massey*, 269 F.3d 251, 268 (3d Cir. 2001). Davis Velasco—the Chief People, Diversity, and Inclusion Officer at Expedia and the final say on Kascsak's candidacy—clearly fits this bill and thus falls within the scope of § 1981.

17.     Venue is proper in this court. For Title VII actions, 42 U.S.C. § 2000e-5(f)(3), "rather than the general venue statute, governs venue." *Pierce v. Shorty Small's of Branson Inc.*, 137 F.3d 1190, 1191 (10th Cir. 1998). And § 2000e-5(f)(3) holds venue is proper "in any judicial district in the State in which (a) the unlawful employment practice is alleged to have been committed, (b) in the judicial district in which the employment records relevant to such practice are maintained and administered, or (c) in the judicial district in which the aggrieved person would have worked but for the alleged unlawful employment practice." Venue is proper in this court under Title VII because, per (a), Kascsak was based in Texas as the Company discriminated against him and, per (c), he would have worked in Expedia's Texas office but for the Company's illicit discrimination.

18.     Likewise, venue is proper under § 1981, which is governed by the general venue statute. 28 U.S.C. § 1391(b). Most of the events in this case involved targeted communications over phone, email, Zoom (or an equivalent video conferencing software), or Linkedin messaging for the purposes of interviewing and recruiting Kascsak while he was present and residing in Austin, Texas. Expedia reached its metaphorical hand into Austin from its various offices and using employees throughout the world. Further, the interview process addressed a job in Austin, Texas, which would have required performance there. Declaration, Ex. A at 4-5. Therefore, a "substantial part of the events [] giving rise to the claim" happened in the Western District of

Texas, and this Court is a proper venue to hear this case. 28 U.S.C. § 1391(b); *see also Atl. Marine Constr. Co. v. U.S. Dist. Court for the W. Dist. Of Tex.*, 571 U.S. 49, 56 (2013) ("[w]hen venue is challenged, the court must determine whether the case falls within one of the three categories set out in §1391(b). If it does, venue is proper ...").

**FACTS**

19.     Expedia's mission is to "power global travel for everyone, everywhere"—unless you're a job applicant at the Company like Kascsak with the wrong immutable traits. 2022 Diversity Report, Ex. F at 4. Fortunately, the law does not allow Expedia to engage in disparate treatment of its job candidates based on race and/or sex. Because Expedia and Davis Velasco discriminated against Kascsak due to his protected characteristics, they are liable to him under various federal and State civil rights statutes.

**A. Expedia's brazen culture of illegal discrimination**

20.     The ideology, practices, and systems at Expedia that enabled and caused it to illegally discriminate against Kascsak started before his first contact with the Company.

21.     In the summer of 2020, Expedia's current and then-Chief Executive Officer Peter Kern, who runs Expedia, Inc., wrote that "Expedia Group has [not] done enough" to remedy "systemic inequalities that exist" in America and thus Expedia "must do better in terms of our own diversity and we will." Kern Letter to Expedia, Ex. D. He diagnosed "systemic racism" as a "plague" for which "we all must be a part of the solution and we each must rededicate ourselves to the cure." Kern Letter to Expedia, Ex. D. Kern also promised to sign a "CEO Action Letter" that would commit the Company to certain diversity initiatives. Kern Letter to Expedia, Ex. D.

22.     Expedia's Global Head of Diversity and Inclusion in 2020, Lauren von Stackelberg, signed the CEO Action Letter on the Company's behalf. That letter remarked "[Expedia] must do

more than speak up and stand with Black people … [it] must dedicate [itself] to relentlessly fighting for real and lasting social change." CEO Action Letter, Ex. E. Accordingly, Expedia "will require inclusive, equitable hiring practices" that discriminate against white and male candidates and do so "at a greater rate" than it was already doing. CEO Action Letter, Ex. E. The Company would "integrate Inclusion & Diversity into our business goals to ensure personal accountability from individual employees all the way to our CEO." CEO Action Letter, Ex. E.

23.    These actions were the catalyst for drastic changes to Expedia's recruiting strategy—rather than flirt with discriminatory hiring practices, the Company would embrace them.

24.    As Expedia's Chief People, Diversity, and Inclusion Officer, Davis Velasco is responsible for the very recruitment policies that the Company, through its CEO and previous Global Head of Inclusion and Diversity, promised would create a more diverse workforce. 2022 Diversity Report, Ex. F at 2.

25.    Some of the recruitment policies mandated by the Company and implemented by Davis Velasco that we know about are illegal race and sex quotas: The Company targets a "binary global gender balance both for leadership and overall by 2025," and apportions at least "25% representation by underrepresented identities" in U.S. hiring. 2022 Diversity Report, Ex. F at 4.

26.    These quotas are facially discriminatory against job candidates like Kascsak.

27.    The Company limits eligibility of its "25% representation by underrepresented identities" quota to "the following race/ethnicity categories: Black/African American, Hispanic/Latina, two or more races, American Indian/American Native, Native Hawaiian/Other Pacific Islander." 2022 Diversity Report, Ex. F at 8-9.[2]

---

[2] In addition to whites, the quota also excludes all Asians from consideration even though demographically many Asian Americans are underrepresented in management and the travel sector. See, e.g., Buck Gee and Denice Peck, *Asian Americans Are the Least Likely Group in the*

28.     Over four particularly odious pages of the 2022 Diversity Report, the demographic auditors at Expedia—led by Davis Velasco—analyze the race and gender balance at the Company as if it were a competition. 2022 Diversity Report, Ex. F at 6-9. For example, Expedia celebrates that the Company achieved a "2.4% point increase in representation of under-represented identifies" from 2021 to 2022 but regrets that it "didn't achieve [its 25% non-white, non-Asian hiring] goal in the desired timeline." 2022 Diversity Report, Ex. F at 8-9. In response, Expedia promises an "intentional focus on racial equity" in hiring to achieve its race quota. 2022 Diversity Report, Ex. F at 8-9.

29.     Page nine of the 2022 Diversity Report isolates hiring as the key driver for Expedia's race quotas. The Company applauds the "increased [] [underrepresented identities] hiring by 3.4% points" in 2022 across all hires before breaking out its hiring analysis into different categories. 2022 Diversity Report, Ex. F at 9. Of relevance on this page is where Expedia analyzes hires for "Leadership (Director and Above)" positions, which from 2021 to 2022 actually *decreased* in "under-represented identity" hiring from 17.5% to 15.9%. 2022 Diversity Report, Ex. F at 9. This was the only category provided by Expedia that saw a decrease, and was the exact category of employment for Kascsak's job.

30.     The Expedia employees central to interviewing Kascsak for this position are so personally and financially invested in diverse hiring that the Company and these individuals forfeit any pretense of race or sex neutrality.

---

*U.S. to Be Promoted to Management*, HARVARD BUS. REV. (May 31, 2018), https://perma.cc/NBF2-FRL6; Levin Dsouza et al., *6 Asian voices on what needs to change in the travel industry*, THE WASH. POST (April 17, 2021) https://perma.cc/N62W-9KJA. So Expedia's racial hiring targets are not only racist, but arbitrarily so based on its own interpretation of "underrepresented." 2022 Diversity Report, Ex. F at 8 (defining underrepresented identities).

31.     For example, Expedia's Senior Vice President of Talent Acquisition Allison Allen was heavily involved in Kascsak's interview process.

32.     In an interview posted on Expedia's website, Allen wrote that "we [the Company] value diversity" in the hiring process. Allen Interview, Ex. G. According to her LinkedIn account, Allen says she is a "inclusion & equity champion"—before listing her actual job with Expedia—and says she feels "ultimately responsible" for how she creates a "diverse and inclusive working environment." Allen Interview, Ex. H at 1.

33.     Davis Velasco's very position—Chief People, Diversity, and Inclusion Officer—is contingent on the amorphous goals of making Expedia a more "diverse" and "inclusive" workplace, *not* a better travel and search function.

34.     In 2022, for the first time, the Company "brought [inclusion and diversity] together with our People team to ensure diversity, equity, and inclusion are woven into, and truly at the center of, our talent processes." 2022 Diversity Report, Ex. F at 4. Davis Velasco's current job as Chief People, Diversity, and Inclusion Officer is the result of this.

35.     And Davis Velasco is credited as the lead author of the very 2022 Diversity Report that reveals publicly the Company's intentions to use race and sex in its hiring process, especially at the senior leadership level. 2022 Diversity Report, Ex. F.

36.     On information and belief, some employees at Expedia—including those involved in Kascsak's hiring decision—also have compensation packages which reward them financially for hiring more diverse employees, as defined by the Company.

**B. Kascsak interviews with Expedia and receives an offer.**

37.     Lisa Christensen, an Executive Recruiting Program Specialist on Expedia's Global Executive Search team, reached out to Kascsak on behalf of the Company on April 6, 2023. Declaration, Ex. A at 4-5.

38.     He was contacted regarding the "Head of Global Talent Sourcing" role at Expedia, akin to Kascsak's previous senior director-level job at Google. Per Christensen's job title and her own words, the Company considered the position "executive level." Declaration, Ex. A at 4-5. After Kascsak confirmed that he was interested, Christensen scheduled Kascsak for an interview with Allison Allen, Expedia's Senior Vice President of Talent Acquisition, on April 25th. Declaration, Ex. A at 5.

39.     The initial interview with Allen was a success. Declaration, Ex. A at 5. Kascsak received great feedback and was scheduled for Zoom interviews with four of Allen's direct reports on May 3 and May 4. Declaration, Ex. A at 5. Kascsak interviewed with James Hawkes, Tina Ahn, Sarah Daffum, and Sean Splaine—all Expedia senior talent acquisition personnel on Allen's global "leadership team." These meetings also went well. Christensen told Kascsak over the phone shortly thereafter he was the "frontrunner" and followed up in an email that his feedback was "resounding." Interview Notes, Ex. P at 3; Christensen Emails, Ex. I at 1; Declaration, Ex. A at 5.

40.     Kascsak was told his last interview in the process would be with Davis Velasco. Declaration, Ex. A at 5; Christensen Emails, Ex. I at 1. Unlike the prior interviews, Davis Velasco directed Kascsak to interview him about Expedia and the role he would fill. Davis Velasco did not ask Kascsak any substantive questions, and Kascsak qualifies this interview as "neutral." Declaration, Ex. A at 5-6.

41. Nonetheless, Kascsak heard back from Christensen with positive feedback about the interview with Davis Velasco and news he'd be hearing from the Company soon. Declaration, Ex. A at 6.

42. Kascsak and Allen spoke by phone on May 19, 2023, where she told him that Expedia was extending him an offer for the role and would reach out via Christensen. Declaration, Ex. A at 6.

43. Christensen called Kascsak on May 22, 2023, and extended him a verbal offer. The quoted compensation package was $330,000 in annual salary, $225,000 in company stock, and $100,000 as a cash signing bonus. Interview Notes, Ex. P at 6; Declaration, Ex. A at 6.

44. Kascsak told Christensen the offer was in the "ballpark" of what he wanted but, as is standard for similar senior roles, he asked whether she felt the Company had any wiggle room to increase his compensation package. He left it to her discretion whether the offer could be increased and she told him she'd circle back with the best offer in writing within a next week. Declaration, Ex. A at 6.

45. Kascsak also asked for an overview of Expedia's benefits and Christensen said she would follow up with an email describing the Company's benefits package after the call. Declaration, Ex. A at 6.

46. Christensen emailed Kascsak the benefits package that afternoon. Christensen Emails, Ex. I at 2. She signed off that email by saying "you'll hear from me again tomorrow." Christensen Emails, Ex. I. And the next day, May 23, 2023, Christensen texted Kascsak, regarding his compensation inquiry, that "things are progressing nicely on [her] end" and she had "one more round of approvals" for the written, final offer she'd likely have "tomorrow." Christensen Texts, Ex. J at 1.

47.     But instead of a job offer, Christensen followed up *the next day* with news that the role was on pause and that she needed to communicate with Allen to learn what happened. Christensen Texts, Ex. J at 1. Then on May 31, Christensen texted Kascsak that the talent acquisition team was going through a reorganization and speculated that the Company might be "going a different direction with the role, possibly Director level." She added that his compensation was now a "challenge." Christensen Texts, Ex. J at 2.

48.     On June 6, Christensen and Kascsak had a phone call so she could update him about the offer and role. She did not provide concrete answers but communicated that Allen's team was undergoing a reduction in force and that he should stand by as that progressed. Declaration, Ex. A at 7.

49.     On his own initiative, Kascsak contacted Allen on June 13 via LinkedIn message and reiterated his interest in the role. Declaration, Ex. A at 7-8; Allen Messages, Ex. K at 1. Allen replied on June 18, "**let's be clear—you are still our top pick.**" Allen Messages, Ex. K at 2.

**C. Expedia stonewalls Kascsak while reopening the position without notifying him.**

50.     But, after Kascsak received the verbal employment offer from Christensen, he was never treated like Expedia's "top pick" for the role. Allen Messages, Ex. K at 2.

51.     Expedia did not follow up substantively for a couple of weeks, so Kascsak contacted Christensen before the Fourth of July to inquire about his status. She replied that "Allison [Allen] just announced her org plans" and that Expedia was now reopening the same role to interview one internal candidate. Christensen Texts, Ex. J at 4.

52.     Christensen's statement was not true: The Company was reopening the search entirely and looking at external applicants.

53.     Various "LinkedIn connections" of Kascsak's were sending him links to the post for the very job he had gotten an offer for in May. LinkedIn Referrals, Ex. L. Further, Amanda Gates—a colleague of Kascsak's at Google—was contacted in late June by Expedia and interviewed for the role. Gates Texts, Ex. M. Gates, who has similar talent acquisition experience as Kascsak, remarked to him that she "could've been … passive pipeline building for female talent." Gates Texts, Ex. M at 2.

**D. Allen reveals discrimination against Kascsak and implicates Davis Velasco in the scheme.**

54.     Finally on August 8, 2023, Christensen followed up with Kascsak via text to let him know she "had news on next steps – finally!" Christensen Texts, Ex. J at 5.

55.     Christensen invited him to fly to New York City to meet with both Davis Velasco, the Company's Chief People, Inclusion, and Diversity Officer, and Allison Allen, SVP of Talent Acquisition. Christensen Texts, Ex. J at 5. Kascsak had already interviewed with both of them in May and received positive feedback. Declaration, Ex. A at 5-7, 9; Allen Messages, Ex. K at 2. He had continued to maintain contact about the role with Allen since May. Kascsak accepted the invitation and arrived in New York on August 14, 2023, for meetings the following day. Declaration, Ex. A at 9.

56.     At six o'clock the night before his scheduled meetings, Kascsak's Expedia contact coordinating his New York visit, Kristin Stencil, emailed him that Davis Velasco "encountered an immoveable conflict tomorrow and he has asked if you would be available to meet with him via Zoom [later that week]." NYC Scheduling, Ex. N at 4. Seeing no other option, he accepted and focused on the meetings the next day.

57.     Kascsak had three meetings on August 15. The first two were via video conference: One with Sarah Sanderson, Expedia's Head of Executive Sourcing based in London, and the other

with Melissa Hutchinson, Expedia's Senior Director of Technology Talent Acquisition based in Seattle. NYC Scheduling, Ex. N at 4. Both conversations went very well, and Kascsak noted that the women spoke to him as if it was already confirmed he'd be joining the Company, alluding to how excited they were to work with Kascsak soon. Declaration, Ex. A at 9.

58.     The last meeting was in person with Allen, who—after exchanging pleasantries— told Kascsak that he "set the bar" amongst the candidates Expedia interviewed. Declaration, Ex. A at 10.

59.     So of course, he asked Allen what happened with the verbal offer the Company gave him in May. Declaration, Ex. A at 10.

60.     Allen first responded that Davis Velasco was concerned about Kascsak's "executive leadership," Declaration, Ex. A at 10, an implausible explanation given Kascask's exceptional resume, the verbal offer, and reviews from the various Expedia interviewers, including Davis Velasco. Declaration, Ex. A at 2-7.

61.     Kascsak realized as much and pressed Allen further. Allen then told him that Davis Velasco, the Company lead on diversity efforts, intervened to preclude Kascsak from joining Expedia. Declaration, Ex. A at 10-11.

62.     Allen admitted that Davis Velasco's (and the Company's) *real* concern was to conduct a more thorough search for diverse candidates to fill this role. Declaration, Ex. A at 10-11.

63.     Kascsak was not "diverse" as Expedia defines it—on protected characteristics alone—and therefore Davis Velasco wanted a search that would discover someone for the role who was. Declaration, Ex. A at 10-11. After learning this, Kascsak was shocked and disappointed. Declaration, Ex. A at 11. But he was determined to still get the job anyway and left the Expedia

office ready to ace his rescheduled interview with Davis Velasco over Zoom the next day. Declaration, Ex. A at 11.

64.     However, Davis Velasco canceled again, also at the last minute and citing an emergency, for their rescheduled interview. Stencil Texts, Ex. O. This was conveyed to Kascsak by Stencil, who said Christensen (the executive recruiter) would be in touch the following week to reschedule yet again. Stencil Texts, Ex. O.

65.     In his last contact with Expedia throughout the hiring process, Christensen called Kascsak and told him the position was instead going to a "late edition Executive internal referral" and she elaborated that Allen told her the Company wanted to go in a "safer direction." Declaration, Ex. A at 11-12. The hiring process at Expedia officially ended for Kascsak.

66.     On information and belief, Kascsak understands that Ms. Bernita Dillard was given the pertinent role instead of him. Dillard is a black woman, and previously Expedia's Director of Diversity Sourcing. Dillard Website, Ex. R.

**E. Harm to Kascsak**

67.     The events above have caused a variety of immense harms to Kascsak for which he seeks relief from this Court.

68.     First, Kascsak remains unemployed and has lost the salary he should have been paid by Expedia had his offer not been illegally delayed and then rescinded. He continues to look for work of similar responsibility and compensation in a similar industry to mitigate damages but has not been offered such a role yet. Declaration, Ex. A at 12. Further, the job market for talent acquisition professionals has *worsened* since the spring and he will now have less leverage and opportunities to find a new employer. *See* Jack Kelly, *Human Resources And Recruiters Are Getting Axed*, Forbes (Mar. 20, 2023), https://perma.cc/SK5B-VY8G; Roy Mauer, *Recruiters*

*Brace for a Challenging Year Ahead*, SHRM (Feb. 24, 2023), https://perma.cc/RHA5-Y6TT. The longer Kascsak stays unemployed, the less attractive he is as a job candidate to potential employers, and thus the less income he can expect at future opportunities. And because of the embrace of diversity initiatives by major corporations, Kascsak's participation in this lawsuit will make him a less attractive candidate for future and equivalent employment in talent acquisition, too. Andrew Ramonas, *S&P 500 Opens Up on Diversity After Floyd as Investors Seek More*, BLOOMBERG LAW (Feb. 11, 2022) http://tinyurl.com/mvnpf68z.

69.     Kascsak's human experience and value was diminished by Expedia because of his non-diverse status. Declaration, Ex. A at 12. There are three distinct instances of discrimination by Expedia here: (1) its decision not to hire him; (2) its decision to prolong his hiring process; and (3) Davis Velasco's refusal to interview him in good faith.

70.     Kascsak continues to lose out on benefits that he would have received had Expedia not withdrawn the offer. Declaration, Ex. A at 13. And the stock he was offered by Expedia as part of his compensation has also since increased in value.

71.     Kascsak has suffered emotional distress from his continued unemployment, in addition to the distress caused by Expedia's discrimination. Declaration, Ex. A at 12.

72.     Accordingly, Kascsak seeks relief from this Court.

### IV. CLAIMS FOR RELIEF

#### COUNT 1: EXPEDIA ILLEGALLY DISCRIMINATED AGAINST KASCSAK BASED ON RACE UNDER TITLE VII

73.     Kascsak realleges the foregoing paragraphs as though fully set forth herein.

74.     Title VII bars discrimination based on race for "refusal to hire" actions. *See Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 707 (5th Cir. 1997) (citing *Page v. Bolger*, 645 F.2d 227,

233 (4th Cir.), cert. denied, 454 U.S. 892 (1981)). And white Americans like Kascsak benefit from the protections of Title VII. *Byers v. Dallas Morning News*, 209 F.3d 419, 425-26 (5th Cir. 2000).

75. In *Hamilton v. Dall. Cnty.*, the Fifth Circuit "restore[d] federal civil rights protections [under Title VII] for anyone harmed by divisive workplace policies that allocate professional opportunities to employees based on their [] skin color, under the guise of furthering diversity, equity, and inclusion." No. 21-10133, 24 (5th Cir. 2023) (Ho, J., concurring). To a "T," this is exactly what Expedia and Davis Velasco did to Kascsak.

76. At the pleading stage of a Title VII claim, a plaintiff need only allege facts "plausibly showing (1) an adverse employment action, (2) taken against a plaintiff because of her protected status." *Hamilton*, *supra* at 12, 12 n.45 (quoting *Cicalese v. Univ. of Texas Med. Branch*, 924 F.3d 762, 767 (5th Cir. 2019)) (internal quotations omitted). This Pleading exceeds this standard and Kascsak can already demonstrate a plausible *prima facie* Title VII racial discrimination claim using "direct or circumstantial evidence" (he has both). *McCoy v. Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007). Cases "built on the latter" are analyzed "under the framework set forth in *McDonnell Douglas Corp. v. Green.*" *Id.* In contrast, "the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985).

77. Kascsak presents direct evidence of racial discrimination by Expedia. In "the context of Title VII, direct evidence includes any statement or written document showing a discriminatory motive on its face." *Herster*, 887 F.3d at 185 (quoting *Portis v. First Nat'l Bank of New Albany*, 34 F.3d 325, 329 (5th Cir. 1994), *as amended on denial of reh'g (*Nov. 10, 1994)).

78. The quotas for racial hiring adopted and publicized by the Company for external hires are *per se* evidence of racial discrimination to make Expedia's workforce less white. 2022

Diversity Report, Ex. F at 4, 8-9; *Ricci v. DeStefano*, 557 U.S. 557, 581-82 (2009); *Cf. Regents of Univ. of Cal. v. Bakke*, 438 U. S. 265, 325–326 (1978) (joint opinion of Brennan, White, Marshall, and Blackmun, JJ.) (racial quotas barred under Title VI).

79.     The quotas are even more damning because, with respect to race, the Company "didn't achieve [its] goal in the desired timeframe" in 2022. 2022 Diversity Report, Ex. F at 8-9. For "Leadership (Director and Above)" positions like the one Kascsak applied for, the Company's minority hiring *decreased*—the only hiring subcategory Expedia analyzed to do so. 2022 Diversity Report, Ex. F at 9. Thus Expedia was motivated to discriminate even more fiercely against white applicants like Kascsak in 2023. And they said as much, promising an "intentional focus on racial equity" in hiring to achieve its race quota. 2022 Diversity Report, Ex. F at 8-9.

80.     Further, Allen *told* Kascsak that Davis Velasco delayed (and then withdrew) Kascsak's offer because he was not a diverse candidate. Declaration, Ex. A at 10-11.

81.     And Christensen stated the Company had a "safer" choice which, considering Kascsak "set the bar" in the interviews and was the Company's "top pick," directly evidences illegal racial discrimination. Declaration, Ex. A at 5-6, 11-12; Allen Messages, Ex. K at 2.

82.     Separately, Kascsak can plead the elements of the "not onerous" *McDonnell-Douglas* test for a *prima facie* circumstantial case of race discrimination. *Patterson v. McLean Credit Union*, 491 U.S. 164, 186 (1989); *but see Hamilton*, *supra* at 12 n.45 ("At the pleading stage, a plaintiff need not plead a prima facie case under the *McDonnell Douglas* framework …"). He can show that (1) he applied for and was qualified for an available position, (2) he was rejected from the position (or some other adverse employment action), and (3) that after he was rejected the Defendant "either continued to seek applicants for the position, or … filled the position with a [employee of a different race]." *Patterson*, 491 U.S. at 186-87 (discussing the *McDonnell Douglas*

*Corp. v. Green* framework in the context of 42 U.S.C. § 1981, 411 U.S. 792, 802-04 (1973));
*Markey*, 635 F.2d at 498 n.1 ("When a plaintiff asserts a claim under 42 U.S.C. § 1981 in tandem with [] Title VII, the elements of" each are "identical."); *Tanner v. McCall*, 625 F.2d 1183, 1193 (5th Cir. 1980) (noting plaintiff satisfies Title VII if he is "rejected [because of protected status] even though the position remained open and the employer continued to consider applicants").

83.     (1) Kascsak presents an abundance of evidence in the attached exhibits that he applied for the Head of Global Talent Sourcing role at Expedia. *E.g.*, Christensen Texts, Ex. J and Allen LinkedIn Messages, Ex. K. He is clearly qualified for the position at issue based on his past experiences and because Expedia gave him an offer for the job. Declaration, Ex. A at 2-7. Expedia (through Allen) told Kascsak he was the Company's "top pick" even though it ultimately withdrew the offer given to him. Allen Messages, Ex. K at 2.

84.     (2) Expedia decided not to hire Kascsak, which is a *per se* adverse employment action. *Green v. Adm'rs of Tulane Educ. Fund*, 284 F.3d 642, 657 (5th Cir. 2002). So is its delay of his interview process. *Tanner*, 625 F.2d at 1193. And post-*Hamilton*, the Company's treatment of Kascsak—particularly by Davis Velasco—while delaying the offer and interviewing others is an *independent* adverse employment action, too. Hamilton, *supra* at 18 ("To adequately plead an adverse employment action, plaintiffs need not allege discrimination with respect to an "ultimate employment decision.").

85.     (3) Kascsak's employment offer was first *delayed* because of race and then ultimately *withdrawn* for this reason, too. *Supra* III. Kascsak, on information and belief, understands that Ms. Bernita Dillard (who is black) was selected for the pertinent role. Dillard Website, Ex. R. But the *McDonnell-Douglas* test is satisfied *even if Expedia hired a white person* for the pertinent role because the Company decided not to hired Kascsak and "continued to

consider applicants" for the position because Kascsak was not a racial minority. *Tanner*, 625 F.2d at 1193 (noting plaintiff satisfies Title VII if he is "rejected [because of protected status] even though the position remained open and the employer continued to consider applicants with similar qualifications"); Declaration, Ex. A at 6-12; Allen Messages, Ex. K at 2; LinkedIn Referrals, Ex. L; Gates Texts, Ex. M.

86.     After meeting the *McDonnell-Douglas* threshold, Kascsak must show his race was a "motivating factor" for Expedia's actions to ultimately win this claim. *Comcast*, 140 S. Ct. at 1017 (comparing § 1981 and Title VII); *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 348 (2013). He satisfies this burden too.

87.     In addition to the direct evidence, Christensen's statement that Expedia went with a "safer" candidate, the Expedia CEO and diversity officers' public promises on diversity initiatives, and Kascsak's own knowledge on how technology companies like Expedia recruit are all circumstantial evidence that race motivated the delay and withdrawal of Kascsak's job offer. Declaration, Ex. A at 10-12; Kern Letter to Expedia, Ex. D; 2022 Diversity Report, Ex. F at 4, 8-9; CEO Action Letter, Ex. E.

88.     And like with college admissions, hiring—especially at the executive level—is a "zero-sum" game where only one person gets the job. *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 143 S. Ct. 2141, 2154 (2023). Expedia's quotas give non-white candidates the benefit of 100% eligibility for jobs across the Company while limiting whites to only 75%, 2022 Diversity Report, Ex. F at 4, and thus the Company "advantage[s] the former at the expense of the latter." *Students for Fair Admissions*, 143 S. Ct. at 2154. Whenever a racial quota is used to make employment decisions, race is a *per se* and illegal motivating factor under Title VII. *See DeStefano*, 557 U.S. at 581-82; *Hamilton*, *supra*. Further, the Company's own

statements regarding the role race plays in its hiring process (including by the CEO), Allen's admission that diversity motivated Expedia's post-offer actions, and Christensen's reference to a "safer" candidate (quoting Allen) all demonstrate the Company's racist motivation. Declaration, Ex. A at 10-12; Kern Letter to Expedia, Ex. D; 2022 Diversity Report, Ex. F; CEO Action Letter, Ex. E.

89. *Students for Fair Admissions* is particularly informative because the admissions schemes at issue were nowhere near as brazen, public, and systemic as Expedia's "intentional" race-conscious hiring here. *Compare* 2022 Diversity Report, Ex. F at 8 (describing Expedia's intent for racial equity). While *Students for Fair Admissions* addressed the Equal Protection Clause and Title VI, 143 S. Ct. at 2208 (Gorsuch, J., concurring), the text in Title VI at issue in *Students for Fair Admissions* is "materially identical language" to that in Title VII. *Id.* at 2216 (Gorsuch, J., concurring). And "both Title VI and Title VII" codify a categorical rule of "individual equality, without regard to race." *Id.* at 2209 (Gorsuch, J., concurring) (citing *Bakke*, 438 U. S. at 416 n.19). Accordingly, if the admissions scheme at issue in *Students for Fair Admissions* was illegal racial discrimination, the quota Expedia uses here must be, too. *See also DeStefano*, 557 U.S. at 581-82.

90. "To plead a disparate-treatment claim under Title VII, a plaintiff must allege facts plausibly showing (1) an adverse employment action, (2) taken against a plaintiff because of her protected status." *Hamilton*, *supra* at 12 (internal quotations omitted). Kascsak exceeds this burden for a Title VII racial discrimination claim against the Defendant Expedia.

### COUNT 2: EXPEDIA ILLEGALLY DISCRIMINATED AGAINST KASCSAK BASED ON RACE UNDER TEXAS LABOR CODE § 21.051

91. Kascsak realleges the foregoing paragraphs as though fully set forth herein.

92.     The legal burden to plead, prove, and win a TCHRA suit for racial discrimination is the same as that under Title VII. *See Horvath v. City of Leander*, 946 F.3d 787, 791 n.3 (5th Cir. 2020) (citing *NME Hasps., Inc. v. Rennels*, 994 S.W.2d 142, 144 (Tex. 1999)).

93.     The aforementioned facts and legal analysis, *supra* IV.Count 1, support the conclusion of illegal race discrimination by Expedia under Title VII, so the same conclusion applies under Texas State nondiscrimination law. *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 781 (Tex. 2018) ("In discrimination [] cases under the TCHRA, Texas jurisprudence parallels federal cases construing and applying *equivalent* federal statutes, like Title VII (emphasis added)").

94.     Accordingly, Kascsak satisfies all the elements for a TCHRA racial discrimination claim against Defendant Expedia.

## COUNT 3: EXPEDIA AND DAVIS VELASCO VIOLATED KASCSAK'S RIGHT TO RACE-FREE CONTRACTING UNDER § 1981

95.     Kascsak realleges the foregoing paragraphs as though fully set forth herein.

96.     "A refusal to enter into an employment contract on the basis of race" implicates *both* Title VII and 42 U.S.C. § 1981. *Patterson*, 491 U.S. at 182. 42 U.S.C. § 1981 provides "broad and sweeping" protection against racial discrimination in making contracts, including employment agreements. *Faraca v. Clements*, 506 F.2d 956, 959 (5th Cir. 1975); *Fadeyi v. Planned Parenthood Assoc. of Lubbock, Inc.,* 160 F.2d 1048, 1051 (5th Cir. 1998) (employment context). And it extends such protections to white plaintiffs, like Kascsak, who are targeted due to their race. *Patterson*, 491 U.S. at 188; *see also McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 286-87 (1976).

97.     "When a plaintiff asserts a claim under 42 U.S.C. § 1981 in tandem with his claim under Title VII, the elements of the § 1981 claim are essentially identical to the elements of the

Title VII claim." *Markey*, 635 F.2d at 498 n.1 (citing *Whiting v. Jackson State University*, 616 F.2d 116, 121 (5th Cir. 1980)). Accordingly, based on facts alleged and the analysis as applied to Title VII in the previous subsection, *supra* III and IV.Count 1, Kascsak fulfills the preliminary elements to plead a § 1981 racial discrimination claim, too.

98.     In addition, winning a § 1981 suit requires a showing of discriminatory intent, *Markey*, 635 F.2d at 498 n.1 (citing *Crawford*, 614 F.2d at 1309), and "but-for" causation rather than the motivating factor under Title VII. *Comcast*, 140 S. Ct. at 1013.

99.     Discriminatory intent is demonstrated through Allen's admission that Davis Velasco obstructed Kascsak's employment and broadened the job search to find a more diverse candidate for the role, plus Christensen's statement that the Company went with the "safer" pick. Declaration, Ex. A at 10-12.

100.     It is further demonstrated by the Company's elevation of Ms. Dillard, a black woman, to the role.

101.     Separately, Expedia's publicly announced racial quota coupled with its failure to "achieve [its racial hiring] goal in the desired timeframe" in 2022 also evidences discriminatory intent. 2022 Diversity Report, Ex. F at 4, 8-9. Kascsak applied for a "Leadership (Director and Above)" position, where the Company's minority hiring *decreased* in 2022—the only hiring subcategory at Expedia to do so. 2022 Diversity Report, Ex. F at 9. Thus Expedia was motivated to discriminate even more fiercely against white applicants like Kascsak in 2023, and they promised an **"intentional focus on racial equity"** in hiring to achieve its race quota. 2022 Diversity Report, Ex. F at 8-9.

102.     So does the CEO Action Letter signed on behalf of Peter Kern, which stated the Company would "stand with Black people" by "require[ing] inclusive, equitable hiring practices." CEO Action Letter, Ex. E.

103.     Finally, Allen and Christensen's observations that Kascsak was the Company's "top pick," that his performance in interviews was "resounding" and that he "set the bar" amongst candidates further clarify that Expedia withdrew the job offer from Kascsak because of race, not merit. Allen Messages, Ex. K at 2; Christensen Emails, Ex. I at 1; Declaration, Ex. A at 10.

104.     Kascsak can show "but-for" causation if "but for" his (white) race, he would have been hired by Expedia. *Comcast*, 140 S. Ct. at 1013. He received an oral job offer with the Company and Allen, the Senior Vice President of Talent Acquisition, told him he was Expedia's "top pick." Declaration, Ex. A at 5-7; Allen Messages, Ex. K at 2. The Company delayed then withdrew the offer because, as conveyed by Allen and Christensen, Davis Velasco—the Chief People, Inclusion, and Diversity Officer at Expedia—wanted a more diverse search pool and ultimately candidate for the position. Declaration, Ex. A at 10-11. If Kascsak weren't white, per the Company's own statements he would have qualified as a diverse candidate for this role and thus his employment offer would not have been delayed and then withdrawn. This is textbook but-for causation based on race.

105.     Further, the racial quotas embraced by the Company and Expedia's promise to be "intentional" about racial equity—especially for Leadership positions like Kascsak's where it fell short in hiring for 2022—evidence race as a "but-for" cause of the offer delay and withdrawal. 2022 Diversity Report, Ex. F at 4, 8-9. Especially since Kascsak was the Company's "top pick." Allen Messages, Ex. K at 2.

106.     Davis Velasco is a valid defendant under § 1981. "District courts within the Fifth Circuit . . . recognize individual liability under § 1981 for supervisors who exercise control over employment decisions and were personally involved in the complained-of conduct." *Thomas*, 2019 WL 486875, at *4; *see also Cardenas*, 269 F.3d at 268.

107.     Davis Velasco's position at Expedia, his proximity and involvement in Kascsak's candidacy, his authoring of the 2022 Expedia Diversity Report, and Allen's admission to Kascsak that it was Davis Velasco who intervened to stop his hiring show he "exercise[s] control over employment decisions" at Expedia—especially at the senior level—and here he was "personally involved in the complained-of conduct." *Thomas*, 2019 WL 486875, at *4 (S.D. Tex. Jan. 8, 2019); 2022 Diversity Report, Ex. F at 2, 4, 8-9; Davis Velasco LinkedIn, Ex. C at 1-2; Declaration, Ex. A at 10-11. And his patent refusal to interview Kascsak in August in light of official Expedia duties to do so supports the inference of racial motivation that is distinct from, but occurring simultaneously with, the Company's race-conscious diversity initiatives.

108.     Accordingly, Kascsak successfully pleads a § 1981 claim against Expedia and Davis Velasco.

### COUNT 4: EXPEDIA ILLEGALLY DISCRIMINATED AGAINST KASCSAK'S BASED ON SEX UNDER TITLE VII

109.     Kascsak realleges the foregoing ¶¶ 1-59 as set forth herein.

110.     Title VII bars discrimination based on sex for "refusal to hire" actions. *See Mattern*, 104 F.3d at 707 (citing *Bolger*, 645 F.2d at 233). And in *Hamilton v. Dall. Cnty.*, the Fifth Circuit "restore[d] federal civil rights protections [under Title VII] for anyone harmed by divisive workplace policies that allocate professional opportunities to employees based on their sex [] under the guise of furthering diversity, equity, and inclusion." *Hamilton*, *supra* at 24 (5th Cir. 2023) (Ho, J., concurring).

111.    "To plead a disparate-treatment claim under Title VII, a plaintiff must allege facts plausibly showing (1) an adverse employment action, (2) taken against a plaintiff because of her protected status." *Hamilton*, *supra* at 12. Kascsak exceeds this burden and can present both direct and circumstantial evidence of sex discrimination by Expedia.

112.    In "the context of Title VII, direct evidence includes any statement or written document showing a discriminatory motive on its face." *Herster*, 887 F.3d at 185 (quoting *Portis*, 34 F.3d at 329).

113.    The quota for a "balanced" workforce along the two sexes adopted and publicized by the Company is *per se* evidence of discrimination based on sex. *See Bostock v. Clayton County*, 140 S. Ct. 1731 (2020); *Hamilton*, *supra*; 2022 Diversity Report, Ex. F at 4, 6-7. Expedia celebrated its "significant progress in hiring [women] … at the leadership level" but noted this is where female attrition was highest, too. To meet and ultimately maintain its gender balance quota, Expedia must discriminate *against* male candidates like Kascsak in hiring for leadership level positions.

114.    Further, Allen's conveyance to Kascsak that Davis Velasco delayed (and then withdrew) Kascsak's offer because he was not a diverse candidate and Christensen's statement the Company had a "safer" choice—especially in light of his having "set the bar" in the interviews and being the Company's "top pick"—directly evidences illegal sex discrimination. Declaration, Ex. A at 5-6, 11-12; Allen Messages, Ex. K at 2.

115.    So does the fact the Company elevated Ms. Dillard, a woman, to the pertinent role.

116.    Separately, Kascsak also satisfies the more permissive *McDonnell-Douglas* test for a *prima facie* circumstantial case of sex discrimination. He can show that (1) he applied for and was qualified for an available position, (2) he was rejected from the position (or some other adverse

employment action), and (3) that after he was rejected the Defendant "either continued to seek applicants for the position, or … filled the position with a [employee of a different sex]." *Patterson*, 491 U.S. at 186-87 (discussing the *McDonnell-Douglas* framework in the context of 42 U.S.C. § 1981); *Tanner*, 625 F.2d at 1193 (noting plaintiff satisfies Title VII if he is "rejected [because of protected status] even though the position remained open and the employer continued to consider applicants").

117.    (1) Kascsak presents plenty of evidence in the Exhibits that he applied for the Head of Global Talent Sourcing role at Expedia. *E.g.*, Christensen Texts, Ex. J and Allen LinkedIn Messages, Ex. K. He is clearly qualified for the position at issue based on his past experiences and because Expedia gave him an offer for the job. Declaration, Ex. A at 2-7. Expedia (through Allen) told Kascsak he was the Company's "top pick" even though it ultimately withdrew the offer given to him. Allen Messages, Ex. K at 2.

118.    (2) Expedia decided not to hire Kascsak, which is a *per se* adverse employment action. *Green*, 284 F.3d at 657. So is its delay of his interview process. *Tanner*, 625 F.2d at 1193. And post-*Hamilton*, the Company's treatment of Kascsak because he was male—particularly by Davis Velasco—while delaying the offer and interviewing others is an *independent* adverse employment action, too. Hamilton, *supra* at 18 ("To adequately plead an adverse employment action, plaintiffs need not allege discrimination with respect to an "ultimate employment decision.").

119.    (3) Kascsak's offer was first *delayed* because of sex and then ultimately *withdrawn* for this reason. *Supra* III. At this time, Kascsak on information and belief, understands that Ms. Bernita Dillard (who is a woman) was selected for the pertinent role. But the *McDonnell-Douglas* test is satisfied *even if Expedia hired a male* for the pertinent role because the Company decided

not to hire Kascsak and continue seeking applicants for the position because Kascsak was male. *Tanner*, 625 F.2d at 1193; *see also Patterson*, 491 U.S. at 186-87; Declaration, Ex. A at 6-12; Allen Messages, Ex. K at 2; LinkedIn Referrals, Ex. L; Gates Texts, Ex. M.

120. After meeting the *McDonnell-Douglas* threshold, Kascsak must show his sex was a "motivating factor" for Expedia to delay his offer and/or not hire him to win this claim. *Comcast*, 140 S. Ct. at 1017; *Nassar*, 570 U.S. at 348. He satisfies this burden from the aforementioned direct and circumstantial evidence, including—but not limited to—the sex quotas, Allen's admission that he was non-diverse, and the Company's elevating a woman to the position.

121. And like with college admissions, hiring—especially at the executive level—is a "zero-sum" game where only one person gets the job. *Students for Fair Admissions*, 143 S. Ct. at 2154. Expedia's gender-balance quotas give female candidates—who are currently only 47.5% of Expedia's workforce and 38.5% of its leadership team—preference for jobs across the Company. 2022 Diversity Report, Ex. F at 4, 6-7. Thus the Company "advantage[s]" female applicants "at the expense of" males in its hiring process, *especially* for leadership positions. *Students for Fair Admissions*, 143 S. Ct. at 2154. This is also exacerbated by Expedia's observation that women are more likely to leave leadership positions and do so earlier than men. 2022 Diversity Report, Ex. F at 6-7. Whenever a sex-balancing quota is used to make employment decisions, sex is a *per se* and illegal motivating factor under Title VII. *See Bostock*, 140 S. Ct. 1731; *cf. DeStefano*, 557 U.S. at 581-82; *Hamilton*, *supra*.

122. *Bostock* and *Hamilton* prohibit, using similar logic as *Students for Fair Admissions*, the discriminatory "gender balanced" hiring scheme Expedia uses. 140 S. Ct. 1731; *see also Students for Fair Admissions*, 143 S. Ct. at 2208-09 (Gorsuch, J., concurring).

123.     The Company also reached out specifically to female candidates like Amanda Gates while pausing Kascsak's offer and hiring process. Gates Texts, Ex. M. This happened around the same time Allen told Kascsak he was the Company's "top pick" and Christensen told him the Company would only be interviewing a single internal candidate. Allen Messages, Ex. K at 2; Christensen Texts, Ex. J at 4.

124.     Finally, Allen's admission that Davis Velasco delayed (and then withdrew) Kascsak's offer because he was not a diverse candidate and Christensen's statement the Company had a "safer" choice corroborate illegal sex discrimination. Declaration, Ex. A at 5-6, 11-12.

125.     Accordingly, Kascsak advances claims against Expedia for sex discrimination under Title VII.

### COUNT 5: EXPEDIA ILLEGALLY DISCRIMINATED AGAINST KASCSAK BASED ON SEX UNDER TEXAS LABOR CODE § 21.051

126.     Kascsak realleges the foregoing ¶¶ 1-59 and 92-107 as though fully set forth herein.

127.     The legal burden to prove and win a TCHRA suit for sex discrimination is the same as that under Title VII. *Horvath*, 946 F.3d at 791 n.3 (citing *Rennels*, 994 S.W.2d at 144).

128.     The aforementioned facts and legal analysis, *supra* IV.Count 4, support the conclusion of illegal sex discrimination by Expedia under Title VII, so the same conclusion applies under Texas State law. *Alamo Heights*, 544 S.W.3d at 781 ("In discrimination [] cases under the TCHRA, Texas jurisprudence parallels federal cases construing and applying *equivalent* federal statutes, like Title VII (emphasis added)").

129.     Accordingly, Kascsak satisfies all the elements for a TCHRA sex discrimination claim against Defendant Expedia.

WHEREFORE, Kascsak respectfully requests that the Court enter judgment in his favor and against the Defendants, and fully award the following relief as permissible under the law:

a. Back pay, front pay, lost benefits, and related compensation, in amounts to be determined at trial;

b. Compensatory damages for *all three* of Expedia's independent violations of Title VII and the TCHRA under *Hamilton*, as allowed: (1) the decision not to hire Kascsak due to his protected status; (2) the decision to delay Kascsak's hiring process due to his protected status; and (3) Davis Velasco's refusal to interview Kascsak due to protected status; and, compensatory damages under § 1981;

c. Emotional distress damages, as allowed;

d. Punitive damages for all three of Expedia's independent violations of Title VII and the TCHRA under *Hamilton*: (1) the decision not to hire Kascsak due to his protected status; (2) the decision to delay Kascsak's hiring process due to his protected status; and (3) Davis Velasco's refusal to interview Kascsak due to protected status; and, punitive damages under § 1981;

e. Declaratory relief;

f. Pre and post-judgment interest at the maximum lawful rate;

g. Attorneys' fees and costs of this action, including any expert witness fees, as appropriate;

h. And any further relief as required by justice.

i. Finally, Plaintiff demands a jury trial on all of the triable issues, including damages.

Respectfully submitted on this TENTH of JANUARY, 2024,

<u>//s Max Schreiber</u>

Ashley Courtney, Esq.
Barred in the Western District of Texas
Liebmann & Liebmann, P.A.
714 N. Spring St.
Pensacola, FL 32501
FL #1030747
ashleycourtney@protonmail.com
845-270-3843

Alexander Liebmann, Esq.*
*bar admission pending
Liebmann & Liebmann, P.A.
714 N. Spring St.
Pensacola, FL 32501
FL #1032726
alex@liebmannlaw.net
845-270-3843

Max Schreiber, Esq.*
*pro hac vice
Of Counsel
Liebmann & Liebmann, P.A.
714 N. Spring St.
Pensacola, FL 32501
IN #37357-45
maxschreiber145@gmail.com
401-408-9370

**PROOF OF SERVICE**

I hereby certify that on January 10, 2024, I electronically filed the foregoing with the Clerk of the United States District Court for the Western District of Texas using the CM/ECF system. Because defense counsel has not yet appeared in this case, I have served this declaration on them via email with their permission.

*/s/Max Schreiber*
Max A. Schreiber
Counsel of Record
