# Exhibit A: Kascsak Declaration

## DECLARATION OF MICHAEL KASCSAK IN SUPPORT OF HIS EMPLOYMENT DISCRIMINATION COMPLAINT

Michael Thomas Kascsak declares as follows pursuant to 28 U.S.C. § 1746:

1. In this declaration I will cover: (1) my personal and professional background; (2) my interview process with Expedia Group, Inc. (hereafter, "Expedia" or "the Company") and subsequent offer to join the company; (3) the subsequent delay of that offer and the Company's insincere continuation of the interview process; (5) my trip to Expedia's New York office where I learned Expedia and its Chief Diversity Officer, Michael Davis Velasco, hesitated to hire me due to my lack of "diversity;" and, (6) damages I've suffered as a result.

2. As a preliminary matter, I also attest to the authenticity of the notes and their details included with the Complaint as Exhibit P. These notes were taken by me at the time of the phone or video interview referenced in their individual titles, and are a complete collection of notes I have from my interactions with Expedia.

### KASCSAK'S PERSONAL AND PROFESSIONAL BACKGROUND

3. My full name is Michael Thomas Kascsak and I have lived in Austin, Texas for 6 years.

4. Because it is relevant to this Declaration and my case, I am a white male, 49 years old, and am straight.

5. I live with my wife, an Iraqi refugee and now proud American citizen, and our eight-year-old daughter. My wife and I have been married for 8 years, and she's been a fantastic stay at home mom for the entirety of our marriage.

1

6.  Right now, I am the sole breadwinner in my family, who rely on me to support us financially.

7.  Since graduating college in 1997, I have worked as a loyal, high-performing and passionate team member in various human resources (HR) and talent acquisition (TA) capacities. My past employers include some of the nation's most recognizable brands, such as Capital One, CBRE, PayPal, and Google. In total, I have twenty-six years of experience in HR and TA, including almost fifteen at the executive-leadership level.

8.  My executive experience in HR and TA at these companies is deep, diverse, and demonstrable.

9.  At Capital One from 2010 to 2014, I was Director of Financial Services Recruitment for the bank. There I supported 20,000+ annual hires, led the implementation of a new talent acquisition tracking system (Taleo), integrated Lean Six Sigma principles into Capital One's recruitment team, drove the Home Loans Recruiting Team's creation, and implemented a recruiting strategy that was adopted company-wide by Capital One. I left Capital One on my own accord to take on the Head of TA role for CBRE, a step in my career progression I had been working towards.

10. I then moved to Head of Talent Acquisition (Americas) at CBRE, one of the world's largest commercial real estate firms, where I worked two and a half years from 2015 to 2017. There, I led a team responsible for 8,000 annual hires and successfully implemented the same acquisition tracking system (Taleo) that improved recruiting efficiency at Capital One. Further, I represented the entire CBRE TA team before the firm's "Global Employment Branding" project and supported the redesign of the company's US and Global careers page. Under my leadership, CBRE secured a No. 15 ranking on Forbes

"2016 Best Employers" list and No. 18 ranking on LinkedIn's "2017 Top Companies to Work For" list. I left CBRE on my own accord to seek a company more aligned with my values and interests that invested more in its people—PayPal gave me this opportunity.

11. My next executive roles were at PayPal/Venmo from 2017 until 2020, where I was Head of Global Technical Talent Acquisition and then Head of Talent Acquisition (Americas). Between these roles, I led more than seventy full time TA employees across America, Europe, India and China. I was the direct report for PayPal's Executive Recruitment team, responsible for the high-stakes hiring of more than sixty executives annually. I was chosen to lead a global hiring "strike" project supporting PayPal's large enterprise business unit, which yielded 100 engineering hires within 120 days—an astonishing success in the industry that exceeded the company's own goals. Finally, I supported a global restructuring project for Tech, Sales, and Marketing that brought 500+ new positions and added 3 new regional footprints to the company. I left PayPal on my own accord for a leadership role with a company, Google, that I admired throughout my entire career and that had an immensely strong brand.

12. Most recently, I worked at Google as the Head of Recruitment Process Outsourcing for Software, North America (leading all third-party recruiting), and then the North America Head of all Software Engineer Sourcing (recruiting) for Google. I was employed by Google for three years, from 2017 until 2020. During my time there, I was responsible for a 275+ person sourcing team plus the company's third-party recruitment sources that handled software engineers. I implemented strategy and performance indicators which supported the successful recruitment of 8,000 engineers annually. I developed and implemented a sourcing structure which introduced news tools and technology to Google's HR "tech-

3

stack" that enabled the quick and efficient identification of prioritized job candidates. And finally, I created and led a "tiger team" dedicated to identifying talented individuals that Google's recruitment process often missed, which proposed and implemented changes to our hiring process to enable more holistic candidate introduction, evaluation, and hiring.

13. I have never been terminated for cause from a position of employment.

14. My total compensation (calculated as reported to the IRS) at Google in 2022 was 547,666, in 2021 was $585,859, and in 2020 was 534,191.

15. Unfortunately, as part of planned layoffs at Google around the Spring of 2023, I was laid off from my role. My termination was not for cause, and I received a severance of 16 weeks salary plus 6 months of paid COBRA health insurance and 6 months of accelerated stock vesting.

16. Nevertheless, I am very passionate about what I do—building teams, identifying high potential individuals, and "selling" my employer to future coworkers—and wanted to get back to work quickly.

### KASCSAK EXCELS IN INTERVIEWS WITH EXPEDIA

17. Accordingly, I was thrilled to hear from Lisa Christensen, who was/is employed by Expedia, on April 6 about a job opportunity with the Company. Christensen is an "Executive Recruiting Program Specialist" on the "Global Executive Search" team with Expedia.

18. The pertinent role she contacted me about was Head of Global Talent Sourcing at Expedia—akin to my recent senior director-level job at Google. Per both Christensen's own words and her job title, the Company considered this position "executive level."

4

Expedia has an office about a half hour from my Austin home and the position would have been "hybrid," where I split work evenly between in home and in office.

19. I told Christensen that I was very interested in the position and, after some brief follow-up, she scheduled me for an interview with Allison Allen, Expedia's Senior Vice President of Talent Acquisition. That interview was scheduled for April 25th.

20. My initial call with Allen went fantastic. We had a great professional connection over the phone and developed instant rapport. We were equally excited about recruiting a new generation of talent to Expedia and its mission to move the world, and I could tell she felt that I would elevate Expedia's TA team in the relevant role.

21. After the successful first-round interview with Allen, I was scheduled for video meetings with four of her direct reports on May 3 and May 4. Those interviews were with James Hawkes, Tina Ahn, Sarah Daffum, and Sean Splaine—all senior members of Allen's "leadership team." And just like my conversation with Allen, I felt great coming out of these interviews, a feeling that was confirmed shortly thereafter by Christensen: She followed up these calls by letting me know over the phone that I was the "frontrunner" for the position and put in writing that the feedback was "resounding."

22. I was then scheduled for a video interview with Michael Davis Velasco, Expedia's Chief People Officer and Chief Diversity Officer. This was my first time meeting him, and I was told by Christensen this was the final interview in the process. My interview with Davis Velasco was different than the others; rather than his asking me questions, he invited me to essentially interview him about working at Expedia. I asked questions about the company's operations, future plans, and my role; Davis Velasco politely provided answers. I describe the call and our rapport as neutral.

5

23. Shortly thereafter, I heard back from Christensen that Davis Velasco gave positive feedback from our conversation and that I'd be hearing from the Company soon, likely with good news.

24. A video call was scheduled with Allen on May 19, 2023. Allen told me on this call that Expedia wanted to extend me an offer for the position and that I would be hearing from Christensen soon after. My excitement was through the roof—I had thoroughly enjoyed the interview process and was ready, without question, to become a senior leader at team Expedia. Before getting off the call I reiterated to Allen how excited I was to get the offer.

25. Christensen called on May 22, 2023, and extended me an initial verbal offer. The compensation package she quoted was $330,000 in annual salary, $225,000 in company stock, and a $100,000 cash signing bonus. We also discussed a tentative possible start date around the week of June 19th. I told Christensen that the offer was in the ballpark of what I was looking for and, if there was any wiggle room, for her to communicate that up appropriately. She said she would do this and circle back next week with the best compensation permitted by Expedia in writing.

26. During that call, I also wanted to know more about the benefits package Expedia offered, and she said she would send the Company's general benefits shortly after.

27. Christensen emailed me that day, May 22, with Expedia's benefits package and signed off by saying "you'll hear from me again tomorrow." I expected to get the written offer letter the next day and was prepared to promptly accept it—even if the original offer was the best compensation they could make.

6

## EXPEDIA DELAYS THE OFFER

28. The next day, May 23, 2023, Christensen texted me that "things are progressing nicely on [her] end" and she had "one more round of approvals" to see if there was any wiggle room in compensation that she would have "tomorrow."

29. I did hear from Christensen on May 23—with horrible news. She told me that the role was now on pause. She sounded upset about what was going on and communicated that she needed to coordinate with Allen to get further details.

30. I was extremely disappointed but remained upbeat. Christensen and I traded text messages over the next week as she tried to coordinate with Allen to figure out what had happened.

31. On May 31, 2023, Christensen communicated to me via text that Allen's TA team was going through a reorganization and speculated the Company might be "going a different direction with the role, possibly Director level," and that my compensation was now a "challenge."

32. Then on June 6, Christensen again reached out to me for a phone call to provide an update as to the role and offer. I did not get any concrete answers as to what was going on nor what had happened with my offer, but learned Allen's team was undergoing a reduction in force (RIF) and was advised to stand by as her team (paraphrasing) "went through the process."

33. On my own accord, I decided to reach out to Allen on June 13 via LinkedIn message and kindly reiterated my interest in the role.

34. Allen replied on June 18, **"let's be clear—you are still our top pick."** She also said she appreciated my "staying connected as [they] run the process."

7

35. After not hearing anything substantive, I reached out again to Christensen a couple weeks later shortly before the Fourth of July to inquire—yet again—about my status with Expedia. She replied that "Allison [Allen] just announced her org plans" and that Expedia was now opening the role to internal candidates. According to her, they had one internal candidate they were now considering.

36. Around this time, I also heard from various past colleagues and contacts in similar roles at other companies that the role had been reposted and advertised on LinkedIn. In a surprising twist of fate, some of my "LinkedIn connections" shared the job posting with me for this role that I'd already received an offer for. Trey McRae, Head of Talent Sourcing at Waymo, LinkedIn messaged me the posting on July 1 and said, "I think you'd kill it in this position." Teresa Hadly, a prominent San Francisco area TA professional, messaged me that the role "would be great" for me and offered to extend a recommendation to Expedia's CTO.

37. Some of my contacts were contacted directly by the Company, including my good friend and former colleague at Google, Amanda Gates, who is still a senior level talent recruiting leader there. She took an interview for the same role, only to be turned down shortly thereafter, and then joked to me that "she could've been . . . passive pipeline building for female talent." While in jest, her comment had a serious message, given both of our familiarity with how major technology corporations like Expedia now actively discriminate based on race, gender, and age in their hiring.

38. July was a quiet month with Expedia, but on August 8, 2023, I heard from Christensen via text saying she "had news on next steps – finally!" She invited me to fly to New York City and meet with both Davis Velasco, the Chief People Officer and Chief Diversity Officer, and Allen, Expedia's SVP of Talent Acquisition. I had already interviewed with both of

8

them back in May, and the invitation came as a surprise—primarily because I was still under the impression that I had a job offer from the Company that was on hold because of a potential RIF.

39. Nevertheless, I took the invitation because I still wanted (needed) the job and flew to New York City to take the meetings.

### IT'S ALL OVER IN NEW YORK

40. I landed in New York on August 14, 2023, ready to participate in conversations with Davis Velasco and Allen the following day.

41. But around 6 p.m. that night, I received an email from an Expedia recruiting contact that Davis Velasco—who I'd traveled to New York to meet again—"encountered an immoveable conflict tomorrow and he has asked if you would be available to meet with him via video conference on Wednesday. August 16 from 3:30 pm – 4:00 pm CT or Friday, August 18 from 12:00 pm – 12:30 pm CT." I obliged and tried to focus on preparing for the meetings the next day.

42. First thing in the morning, I had a video call in my hotel room with Expedia's Head of Executive Sourcing, Sarah Sanderson, who was based out of London. That meeting—like all my other conversations with Expedia employees beside Davis Velasco—went great. I then went into the Expedia office for noon and, since Davis Velasco canceled, had a video discussion from the office with Melissa Hutchinson, Expedia's Senior Director, Technology Talent Acquisition. That discussion, similarly, went very well. In fact, it'd be inaccurate to label the conversations as "interviews" because both employees communicated to me that they were excited to work with me in the near future.

### ALLEN REVEALS THE DISCRIMINATORY TRUTH

43. Next up was Allen, who I was meeting in person for the first time. Like our prior conversations, this one started out just as well as my video chats in the morning. We exchanged pleasantries and she apologized for Davis Velasco's last-minute absence. She also reiterated a common theme I'd heard since starting the interview process: that I **"set the bar"** amongst all the candidates for the job.

44. After discussing the role again for a little while, she apologized for Davis Velasco's cancellation and said she would try to get Davis Velasco to come to Austin if possible. She said he shows up much better in person than he does over video/phone, but if that wasn't possible we'd keep the video call with him for the following day.

45. I also asked about the offer, as the Company still hadn't explained what happened—I kept getting told I was the top candidate, and yet the written offer still hadn't been sent.

46. According to Allen, the holdup was frustration from Davis Velasco about my candidacy. She originally characterized Davis Velasco's concern as about my "executive leadership (or presence or influence)." To me—and to her, as I gathered from this conversation—this was off the mark, given both my industry experience and the feedback I'd received from the entire Expedia team throughout the process—including from Davis Velasco, who had communicated to Christensen in May that our initial call was positive.

47. I dug deeper and tried to get more precision from Allen about Davis Velasco's reservations.

48. Allen finally did communicate the truth: The written offer was never sent because Davis Velasco wanted to (paraphrasing) "search a more in depth and diverse candidate pool" for this role.

49. Allen clearly conveyed the Company had a discriminatory intent in delaying (or, by this point, withdrawing) my offer. Either my race, my gender, or my age (or perhaps all three) was being weaponized against me. It was, and would have been, clear enough to anyone in my shoes that Expedia and Davis Velasco wanted someone more "diverse" than myself in this position.

50. On top of that, my vast experience in talent acquisition and HR at major technology firms made her comment about Davis Velasco's hesitations even clearer. I know from experience that companies like Expedia discriminate to meet diversity targets behind closed doors, and now I was a victim of this scheme. Based on what Allen said and my own knowledge of technology recruitment practices, my race, age, and sex worked against me due to Expedia and Davis Velasco's interest in a diverse candidate.

51. I left the meeting with Allen (and the day at Expedia) depressed and disappointed. But I still had one meeting left over video conference on August 16, 2023, with Davis Velasco—one last chance to impress him and show, regardless of my "non-diverse" status, I was the best person for this role.

52. But Davis Velasco had other ideas. On the day of the meeting, Kristin Stencil—the Expedia recruiting aide who helped schedule my New York City visit—reached out via text to let me know that Davis Velasco, yet again, "encountered an emergency outside the office" and would have to reschedule the meeting.

53. The next day, I spoke with Christensen over the phone. There would be no rescheduling with Davis Velasco. In fact, there would be no offer or role with Expedia at all anymore. The Company decided to hire, according to Christensen, a (paraphrasing) "late edition executive internal referral." Christensen elaborated that the Company, allegedly through

11

Allen, communicated to her that they wanted to go in "safer" direction. Finally, I had gotten clarity—the Company had rescinded my offer and terminated my candidacy.

54. On information and belief—supported by both Allen and Christensen's words, plus my expert understanding of HR/TA recruitment schemes at major tech firms like Expedia—this final decision was also due to my status as a "non-diverse" executive candidate.

55. Since May, I have continued to look for similar roles as the one I was offered at Expedia and the one I had at Google in good faith.

### MY HARMS FROM EXPEDIA'S BEHAVIOR

56. I'd like to describe some of the harms that I've suffered because of the aforementioned events.

57. First and foremost, I am utterly humiliated by how the hiring process turned out and the rationale provided by the Company, through Allen, for my ultimate rejection. As a victim of prohibited discrimination based on immutable characteristics, my value as a human being has been crushed based on traits I cannot control.

58. I have also suffered distress due to my continued unemployment, which I thought was remedied by the job offer extended to me in May. My family relies on me for financial support and I have been unable to provide it since.

59. I decided not to pursue opportunities with other employers when I was originally extended the offer from Expedia. These interview opportunities and job openings are no longer available.

60. The economy has worsened significantly in technology hiring, especially in supportive functions like HR and TA, since the offer was extended in May 2023. I now have less opportunity and leverage for interviews, hiring, and compensation.

61. My expected income at future employers continues to decline as I take time away from work and lose out on experiences that I can use to sell my own capabilities.

62. I did not receive any of the benefits that I would have while employed at Expedia.

## CONCLUSION

63. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 8, in Austin, Texas.

_Michael Kascsak_

Notarized by: Petro Heidel
(sign on top line, print immediately aove)

PETRO HEIDEL
Notary Public, State of Texas
Comm. Expires 06-14-2026
Notary ID 133811357

13