# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | | |
|---|---|---|
| **MICHAEL KASCSAK,** | § | |
| *Plaintiff* | § | |
| | § | |
| **v.** | § | **No. 1:23-CV-01373-DII** |
| | § | |
| **MICHAEL DAVIS VELASCO,** | § | |
| **EXPEDIA, INC.,** | § | |
| *Defendants* | | |

## REPORT AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

TO:   THE HONORABLE UNITED STATES DISTRICT JUDGE

Before the Court is Defendant Michael Davis Velasco and Expedia, Inc.'s (collectively, "Defendants") Motion to Dismiss, Dkt. 12. After reviewing the associated briefing and relevant caselaw, the undersigned recommends that the motion be GRANTED in part.

## I.   BACKGROUND

This case surrounds Plaintiff Michael Kascsak, a white man who alleges that he was denied an executive position at Expedia due to his race and sex. For more than fifteen years, Kascsak has served as a senior corporate executive, specializing in talent acquisition and human resources for major corporations, including Capital One, PayPal, and Google.[1] Dkt. 8, at 3.

---

[1] Given the procedural posture of this dispute, the undersigned accepts all of Kascsak's well-pleaded facts as true. *See Davis v. Tarrant Cnty., Tex.*, 565 F.3d 214, 217 (5th Cir. 2009) ("In ruling on a motion to dismiss, a court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.") (internal quotation marks omitted).

Expedia, a Washington-based corporation, is one of the world's largest online travel agencies. *Id.* On April 6, 2023, Lisa Christensen—an Executive Recruiting Specialist on Expedia's Global Executive Search team—reached out to Kascsak regarding the "Head of Global Talent Sourcing" role at Expedia. *Id.* at 13. After Kascsak confirmed that he was interested, Christensen scheduled him for an interview with Allison Allen, Expedia's Senior Vice President of Talent Acquisition, on April 25. *Id.* The initial interview with Allen went well, as Kascsak received "great feedback." *Id.* Kascsak then interviewed with four Expedia senior talent acquisition personnel on Allen's global "leadership team." *Id.* Those meetings also went well. *Id.* Christensen told Kascsak on the phone shortly thereafter that he was the "frontrunner" and followed up in an email that his feedback was "resounding." *Id.*

Kascsak was told that his last interview in the process would be with Velasco. *Id.* The interview was a bit unorthodox, as Velasco did not ask any substantive questions and instead asked Kascsak to interview *him*. *Id.* Kascsak qualifies this interview as "neutral." *Id.* Nevertheless, Christensen reached out to Kascsak with positive feedback about the Velasco interview and said Kascsak would be hearing from Expedia soon. *Id.* at 14.

Allen offered Kascsak the job on May 19 and said that the company would be reaching out via Christensen. *Id.* Christensen called Kascsak on May 22 and extended him a verbal offer. *Id.* The quoted compensation package was $330,000 in annual salary, $225,000 in company stock, and $100,000 as a cash signing bonus. *Id.* Kascsak responded that this offer was "in the ballpark" of what he wanted, but asked

whether there was any "wiggle room" to increase his compensation. *Id.* Allen replied that she would circle back with "the best offer" in the next week, and that she would follow up with an email describing Expedia's benefits package. *Id.*

Christensen emailed Kascsak the benefits package the same day and signed off the email by saying "you'll hear from me again tomorrow." *Id.* The next day, Christensen texted Kascsak that "things are progressing nicely on [her] end" regarding the compensation inquiry and that she had "one more round of approvals" for the written, final offer she would likely have by "tomorrow." *Id.*

The next day, Christensen followed up with some unexpected news. Instead of an updated job offer, Christensen said that the role was on pause, and she needed to communicate with Allen to learn what happened. *Id.* at 15. On May 31, Christensen texted Kascsak that the talent acquisition team was going through a reorganization and speculated that Expedia might be "going a different direction with the role, possibly Director level." *Id.* She added that his compensation was now a "challenge." *Id.* On June 6, Christensen told Kascsak that Allen's team was undergoing a reduction in force and that he should stand by. *Id.* Kascsak contacted Allen via LinkedIn on June 13, reiterating his interest in the role. *Id.* Allen responded on June 18, "let's be clear—you are still our top pick." *Id.*

Expedia did not follow up substantively for several weeks, so Kascsak contacted Christensen in early July to inquire about his status. *Id.* She replied that Allen "just announced her org plans" and that Expedia was reopening the role to one

internal candidate. *Id.* Indeed, various LinkedIn connections sent Kascsak links to posts for the same job he had gotten an offer for in May. *Id.* at 16.

In early August, Christensen followed up with Kascsak to let him know she "had news on next steps—finally!" *Id.* Christensen invited Kascsak to fly to New York City to meet with Velasco and Allen, whom Kascsak had already interviewed with. *Id.* But at 6pm the night before his scheduled meetings, a contact at Expedia emailed Kascsak that Velasco "encountered an immoveable conflict" and asked if he could meet by Zoom later that week instead. *Id.* Kascsak accepted and proceeded with other meetings he had scheduled with Expedia officers. *Id.* On August 15, Kascsak met with two Expedia officers, and "[b]oth conversations went very well." Id. at 17.

Kascsak's final meeting was with Allen, who told him that he "set the bar" amongst the candidates Expedia had interviewed. *Id.* Naturally, Kascsak asked why Expedia had gone back on its verbal offer from May. *Id.* After some vacillating, Allen told him that Velasco, Expedia's lead on diversity efforts, "intervened to preclude Kascsak from joining Expedia." *Id.* "Allen admitted that Velasco's (and the Company's) *real* concern was to conduct a more thorough search for diverse candidates to fill this role." *Id.*

Kascsak was scheduled to meet with Velasco via Zoom the next day, but Velasco canceled again, citing an emergency. *Id.* at 18. In his last contact with Expedia, Christensen called Kascsak and told him that the position was going to a "late edition Executive internal referral" and that Expedia wanted to go in a "safer

direction." *Id.* Kascsak later discovered that the role went to Bernita Dillard, a Black woman and Expedia's former Director of Diversity Sourcing. *Id.*

## II.   LEGAL STANDARDS

### A.   12(b)(2)

The Federal Rules of Civil Procedure allow a defendant to assert lack of personal jurisdiction as a defense to suit. Fed. R. Civ. P. 12(b)(2). On such a motion, "the plaintiff bears the burden of establishing the district court's jurisdiction over the nonresident." *Stuart v. Spademan*, 772 F.2d 1185, 1192 (5th Cir. 1985). The court may determine the jurisdictional issue "by receiving affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery." *Id.* But when, as here, the Court rules on the motion without an evidentiary hearing, the plaintiff need only present a *prima facie* case that personal jurisdiction is proper; proof by a preponderance of the evidence is not required. *Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235, 241 (5th Cir. 2008). Uncontroverted allegations in a plaintiff's complaint must be taken as true, and conflicts between the facts contained in the parties' affidavits must be resolved in the plaintiff's favor. *Id.* Nevertheless, a court need not credit conclusory allegations, even if uncontroverted. *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 869 (5th Cir. 2001) (per curiam).

### B.   12(b)(6)

Pursuant to Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a 12(b)(6) motion, a "court accepts 'all well-pleaded facts as true, viewing them in the

light most favorable to the plaintiff.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin K. Eby Constr. Co. v. Dall. Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). That is, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* A court ruling on a 12(b)(6) motion may rely on the complaint, its proper attachments, "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Dorsey v. Portfolio Equities, Inc.,* 540 F.3d 333, 338 (5th Cir. 2008) (citations and internal quotation marks omitted). A court may also consider documents that a defendant attaches to a motion to dismiss "if they are referred to in the plaintiff's complaint and are central to her claim." *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004).

6

But because the court reviews only the well-pleaded facts in the complaint, it may not consider new factual allegations made outside the complaint. *Dorsey,* 540 F.3d at 338. "[A] motion to dismiss under 12(b)(6) 'is viewed with disfavor and is rarely granted.'" *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (quoting *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009)).

## III.    DISCUSSION

### A.    12(b)(2) Motion to Dismiss

Kascsak alleges that, while in New York, Velasco issued a directive for Expedia to not hire Kascsak and to instead "look for a more diverse candidate." Dkt. 8, at 6.[2] Defendants argue that Kascsak's claim against Velasco should be dismissed for lack of personal jurisdiction. They contend that Velasco lives and works in New York and does not have sufficient contacts with Texas to warrant a finding of personal jurisdiction in a Texas forum. Dkt. 12, at 6.[3]

---

[2] Kascsak also argues that Velasco had other ties to Texas more generally. For instance, Kascsak alleges that "the diversity and hiring policies that Velasco promulgates are implemented specifically in Texas by Expedia's Austin office." Dkt. 13, at 6. Kascsak further alleges that "Velasco travels into Texas as part of his job and to promote such discriminatory workplace policies, of which Kascsak was ultimately the victim." *Id.* But nowhere does Kascsak allege a nexus between these actions (traveling to Texas for work and promoting diversity policies generally) and his alleged harm (not being hired by Expedia). "Specific jurisdiction … requires a sufficient nexus between the non-resident's contacts with the forum and the cause of action." *Clemens v. McNamee*, 615 F.3d 374, 378-79 (5th Cir. 2010). Accordingly, the undersigned will only consider Velasco's relevant conduct—namely, his issuing a directive to not hire Kascsak and to search for more diverse job candidates.

[3] Defendants also argue that, even if personal jurisdiction exists, the fiduciary shield doctrine prevents the Court from exercising jurisdiction over Velasco. Dkt. 12, at 8. Because the undersigned concludes that the Court does not have personal jurisdiction over Velasco, there is no need to consider the fiduciary shield argument.

"A federal court sitting in diversity may exercise jurisdiction over a nonresident defendant only if: (1) the state's long-arm statute would confer jurisdiction; and (2) due process is satisfied under the Fourteenth Amendment to the United States Constitution." *Turner v. Harvard MedTech of Nevada, LLC*, 620 F. Supp. 3d 569, 574 (W.D. Tex. 2022). Because the "Texas long-arm statute has been interpreted as extending to the limits of due process," "the jurisdictional analysis is collapsed into one inquiry as to whether jurisdiction comports with federal due process." *Id.* Kascsak only alleges specific—and not general—personal jurisdiction against Velasco. Dkt. 8, at 4. Accordingly, the undersigned will only consider whether this Court has specific personal jurisdiction over Velasco.

"[S]pecific jurisdiction exists when a defendant purposefully avails itself of the privilege of conducting activities within a forum state, the plaintiff's claims arise out of or relate to the defendant's 'minimum contacts,' and maintaining the suit would not offend traditional notions of fair play and substantial justice." *Pace v. Cirrus Design Corp.*, No. 22-60603, 2024 WL 739343, at *11 (5th Cir. Feb. 23, 2024). Importantly, "mere injury to a forum resident is not a sufficient connection to the forum" to establish personal jurisdiction. *Walden v. Fiore*, 571 U.S. 277, 290 (2014). Rather, the minimum contacts analysis "looks to the defendants' contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Id.* at 285. But "[s]o long as it creates a 'substantial connection' with the forum, even a single act can support jurisdiction." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 n.18 (1985).

The Supreme Court recently addressed the issue of personal jurisdiction over intentional tortfeasors in *Walden v. Fiore*. That case involved a Georgia law enforcement officer who seized cash from two Nevada residents passing through Georgia and refused to return it to them for a prolonged period. *Walden*, 571 U.S. at 279-80. The defendant "knew his allegedly tortious conduct in Georgia would delay the return of funds to plaintiffs with connections to Nevada." *Id.* at 279. Nevertheless, the Court held that the officer lacked minimum contacts with Nevada:

> Applying the foregoing principles, we conclude that petitioner lacks the "minimal contacts" with Nevada that are a prerequisite to exercise of jurisdiction over him. It is undisputed that no part of petitioner's course of conduct occurred in Nevada. Petitioner approached, questioned, and searched respondents, and seized the cash at issue, in the Atlanta airport. It is alleged that petitioner later helped draft a "false probable cause affidavit" in Georgia and forwarded that affidavit to a United States Attorney's Office in Georgia to support a potential action for forfeiture of the seized funds. Petitioner never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to Nevada. In short, when viewed through the proper lens—whether the defendant's actions connect him to the forum—petitioner formed no jurisdictionally relevant contacts with Nevada.

*Id.* at 288-89.

The undersigned finds that the same reasoning applies here and concludes that Kascsak has not alleged sufficient facts for this Court to exercise personal jurisdiction over Velasco. Velasco's alleged action—issuing a directive from New York for Expedia to not hire Kascsak and to search for more diverse applicants—was not targeted at Texas. Rather, Kascsak's status as a Texas resident was "random," "fortuitous," and "attenuated"—exactly the sort of contacts that the Supreme Court has held are insufficient to confer personal jurisdiction. *Burger King*, 471 U.S. 475. Moreover, applying the test from *Walden*, Velasco "never traveled to, conducted activities

within, contacted anyone in, or sent anything or anyone to" Texas.[4] *Walden*, 571 U.S. at 289. Accordingly, this Court may not exercise personal jurisdiction over Velasco consistent with the Due Process Clause.

That conclusion is bolstered by the Fifth Circuit's recent opinion in *Danziger & De Llano, L.L.P. v. Morgan Verkamp, L.L.C.*, 24 F.4th 491 (5th Cir. 2022). There, a Texas-based law firm signed an agreement with an Ohio-based law firm to split fees in certain cases. *Id.* at 494. The Texas firm alleged that the Ohio firm had breached its agreement by not appropriately sharing fees in a case, and sued for fraud, unjust enrichment, and tortious interference. *Id.* Relying on *Walden*, the court reasoned that while the Ohio firm's "allegedly tortious conduct may have *affected* [plaintiff] in Texas, none of this conduct *occurred* in Texas." *Id.* at 497. Specifically, the court noted that the only act by the Ohio firm "that is even plausibly connected to Texas" was a single reply to an unsolicited email by the Texas firm. *Id.* at 498. Accordingly, the court held that "Texas courts do not have personal jurisdiction over [plaintiff's] personal jurisdiction claims against [defendant]." *Id.*

In short, Velasco did not have any relevant contact with Texas, so this Court may not exercise personal jurisdiction over him. Accordingly, the undersigned recommends granting Defendants' motion to dismiss Velasco from the suit.

### B.    Section 1981

Defendants also argue that "Kascsak's claim for race discrimination under 42 U.S.C. § 1981 against both Expedia and Velasco should be dismissed because Kascsak

---

[4] As noted above, *supra* note 2, Velasco's alleged travel to and activities in Texas lack a sufficient nexus to Kascsak's specific injury to be considered for this analysis.

fails to plausibly allege that his race was the but-for cause of the failure to hire him." Dkt. 12, at 11. Essentially, Defendants argue that because Kascsak alleged he was discriminated against because of his race *or* his gender *or* his age, he did not allege but-for race discrimination. *See* Dkt. 8-1, at ¶¶ 49, 50 ("Either my race, my gender, or my age (or perhaps all three) was being weaponized against me" and "my race, age, and sex worked against me."). Kascsak, on the other hand, argues that he is entitled to plead both race and sex discrimination without defeating his Section 1981 claim for race discrimination. Dkt. 13, at 12.

The Supreme Court laid out the standard for Section 1981 but-for causation in *Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 140 S. Ct. 1009, 1019 (2020). There, a television studio sued Comcast for allegedly disfavoring Black-owned media companies. *Id.* at 1013. In deciding the case, the Ninth Circuit held that a plaintiff alleging a Section 1981 claim "must only plead facts plausibly showing that race played 'some role' in the defendant's decisionmaking process." *Id.* The Supreme Court reversed, holding that to prevail on a Section 1981 claim, "a plaintiff must initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right." *Id.* at 1019. To make that determination, the court asks "the counterfactual—what would have happened if the plaintiff had been white?"[5] *Id.* at 1015.

---

[5] The text of Section 1981 provides that "[a]ll persons … shall have the same right … to make and enforce contracts, to sue, be parties, [and] give evidence … as is enjoyed by white citizens." 42 U.S.C. § 1981. The Supreme Court has interpreted that language as protecting white individuals as well. *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 278-80 (1976). Accordingly, in the context of Kascsak's claim, the question is appropriately phrased as "what would have happened if the plaintiff had been another race?"

A split of authority among the district courts of the Fifth Circuit currently exists regarding whether pleading a claim for intersectional discrimination necessarily defeats a Section 1981 claim. Some courts, including this one, have held that pleading multiple bases for discrimination (race, sex, age, etc.) destroys a Section 1981 claim. *See Hopkins v. Sch.*, No. 1:21-CV-0334-RP, 2023 WL 5186881, at *4 (W.D. Tex. Aug. 11, 2023) ("Here, Hopkins does not claim race was a but-for cause of his injury; he claims that he was fired at least partially because of his alleged whistleblowing activities. Therefore, he has not sufficiently pled a § 1981 claim."); *see also McKenzie-El v. Am. Sugar Ref., Inc.*, No. 21-1089, 2021 WL 5412341, at *2 (4th Cir. Nov. 19, 2021) (affirming dismissal of Section 1981 claim where plaintiff "pled that his age, religion, and complaints to human resources were causes of his employer's actions."); *Postell v. Fallsburg Library*, No. 20-CV-03991 (NSR), 2022 WL 1092857, at *9 (S.D.N.Y. Apr. 8, 2022) (holding that plaintiff's allegation that "Defendant intentionally discriminated against him because of his race, gender, or age" "precludes this Court from a determination of race as the but-for cause for the Defendant's alleged misconducts").

Still, at least one other court in this circuit has held that pleading an intersectional claim is not fatal to a Section 1981 cause of action. In *Thomas v. Cook Children's Health Care Sys.*, No. 4:20-CV-01272-O, 2021 WL 4796679, at *7 (N.D. Tex. July 28, 2021), *aff'd*, No. 22-10535, 2023 WL 5972048 (5th Cir. Sept. 14, 2023), the court considered a doctor's claims for race and sex discrimination, among others. The court held that "pleading a mixed-motive or intersectional claim under Title VII

or Texas state law does not affect the validity of Plaintiff's Section 1981 claim because

Section 1981's 'but for' causation does not mean the 'sole' reason." *Id.* at 7.

The Fifth Circuit ruled on a similar issue in the ADEA context (which also

requires but-for causation) in *Leal v. McHugh*, 731 F.3d 405 (5th Cir. 2013). There,

an employee alleged that he was not hired for a position because of his age and, at

least in part, because another candidate "had a close personal relationship" with the

individual making the hiring decision. *Id.* at 408. The district court dismissed the

ADEA claim, holding that it "asserted a mixed-motive case, which is prohibited." *Id.*

at 409. The Fifth Circuit rejected that argument, noting that "[b]y dismissing

Appellants' complaint on the basis that they 'have asserted a mixed-motive case,

which is prohibited,' the district court misreads *Gross*, since 'but-for cause' does not

mean 'sole cause'."[6] *Id.* at 415.

The undersigned finds the latter line of cases more persuasive. In *Bostock v.*

*Clayton Cnty., Georgia*, 590 U.S. 644, 656 (2020), the Supreme Court explained the

meaning of but-for causation in the Title VII context.

> In the language of law, this means that Title VII's "because of" test
> incorporates the "simple" and "traditional" standard of but-for
> causation. That form of causation is established whenever a particular
> outcome would not have happened "but for" the purported cause. In
> other words, a but-for test directs us to change one thing at a time and
> see if the outcome changes. If it does, we have found a but-for cause.
>
> This can be a sweeping standard. Often, events have multiple but-for
> causes. So, for example, if a car accident occurred *both* because the
> defendant ran a red light *and* because the plaintiff failed to signal his

---

[6] *Gross v. FBL Fin. Services, Inc.*, 557 U.S. 167, 169 (2009), held that a mixed-motive jury instruction is never proper in an ADEA case.

13

turn at the intersection, we might call each a but-for cause of the collision.

*Id.* at 656.

Applying that standard to this case, it is clear that Kascsak has alleged that race was a but-for cause of his injury. Kascsak alleges that Velasco did not hire him so that Expedia could search for more diverse candidates. Had Kascsak been Black instead of white, he would have been a "diverse" candidate and therefore would have been hired, or so Kascsak alleges. *See Comcast*, 140 S. Ct. at 1015 ("[W]hat would have happened if the plaintiff had been white?"). Accordingly, Kascsak's race was a but-for cause of his injury. That is true even if his age or sex were *also* but-for causes of his injury.

The undersigned finds that Kascsak has adequately pleaded a claim under 42 U.S.C. § 1981. Accordingly, Defendants' motion to dismiss the Section 1981 claims should be denied.

## IV.    RECOMMENDATION

In accordance with the foregoing discussion, the undersigned **RECOMMENDS** that the District Court **GRANT IN PART** Defendants' Motion to Dismiss. Michael Davis Velasco should be dismissed for want of personal jurisdiction, but Kascsak's Section 1981 claims should not be dismissed. **IT IS FURTHER ORDERED** that this case be removed from the Magistrate Judge's docket and returned to the docket of the Honorable United States District Judge.

## V.     WARNINGS

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987). A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen days after the party is served with a copy of the Report shall bar that party from *de novo* review by the District Court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 150-53 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

SIGNED March 22, 2024.


DUSTIN M. HOWELL
UNITED STATES MAGISTRATE JUDGE