```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF TEXAS
 2                        AUSTIN DIVISION

 3  MICHAEL KASCSAK,                   ) AU:23-CV-01373-DII
                                       )
 4     Plaintiff,                      )
                                       )
 5  v.                                 ) AUSTIN, TEXAS
                                       )
 6  EXPEDIA, INC.,                     )
                                       )
 7     Defendant.                      ) OCTOBER 3, 2024

 8         ********************************************
                TRANSCRIPT OF MOTIONS HEARING
 9          BEFORE THE HONORABLE DUSTIN M. HOWELL
           ********************************************
10
    APPEARANCES:
11
    FOR THE PLAINTIFF:   NICOLE J. MOSS
12                       SAMUEL D. ADKISSON
                         COOPER & KIRK, PLLC
13                       1523 NEW HAMPSHIRE AVENUE, N.W.
                         WASHINGTON, D.C. 20036
14
    FOR THE DEFENDANT:   AMY LEE DASHIELL
15                       LAUREN CHRISTINE DITTY
                         SCOTT DOUGLASS & MCCONNICO LLP
16                       303 COLORADO STREET, SUITE 2400
                         AUSTIN, TEXAS 78701-3234
17
    TRANSCRIBER:         ARLINDA RODRIGUEZ, CSR
18                       501 WEST 5TH STREET, SUITE 4152
                         AUSTIN, TEXAS 78701
19                       (512) 391-8791

20

21

22

23

24  Proceedings recorded by electronic sound recording, transcript

25  produced by computer.
```

```
 1        (Proceedings began at 2:03 p.m.)

 2            THE CLERK:  The Court calls A:23-CV-1373,

 3  Michael Kascsak v. Expedia, Inc. for a Motion Hearing.

 4            THE COURT:  Good afternoon, everyone.  If

 5  you'll give me just a second here to get situated here at

 6  the bench, we can get started.

 7            Okay.  I'll introduce you to my team here, and

 8  then I'd like you-all to state your names for the record.

 9  So Katherine Wallace is a courtroom deputy in the clerk's

10  office helping us today, and Frankie Wool is the career

11  clerk in my chambers who is also helping me with this

12  case.

13            Counsel, if you will state your names for the

14  record, starting with the plaintiff.

15            MS. MOSS:  Good afternoon, Your Honor.  Nicole

16  Moss with Cooper & Kirk on behalf of the plaintiff.  And

17  I have with me ...

18            MR. ADKISSON:  Good afternoon, Your Honor.

19  Samuel Adkisson also, with Cooper & Kirk on behalf of the

20  plaintiff.

21            MS. MOSS:  And the plaintiff, Mr. Kascsak, is

22  here as well, Your Honor.

23            MR. KASCSAK:  Good afternoon, Your Honor.

24            THE COURT:  Good afternoon.

25            MS. DASHIELL:  Good afternoon, Your Honor.
```

 1  Amy Dashiell with Scott Douglass & McConnico on behalf of

 2  Expedia, Inc.  And with me I have Lauren Ditty from our

 3  office, and also Brooke Davey from our office, who is

 4  handling the IT end.

 5           THE COURT:  Good afternoon to you as well.

 6           Okay.  So I like to start hearings by, you

 7  know, sharing some of my impressions from having read the

 8  parties' papers, and so I'm going to do that here.

 9           So, first of all, the joint advisory was very

10  helpful.  I appreciate the parties conferring

11  meaningfully and putting that document together.  It was

12  helpful in organizing what's left of the disputes in this

13  discovery motion.  And so thank you for that.

14           Overall, I tend to agree with Plaintiff, that

15  the documents related to Expedia's DEI hiring initiatives

16  go to the but-for causation element of his claim.  And I

17  don't doubt that the scope of what's sought is broad, but

18  it does seem that the larger company policies are

19  relevant, and the discussions around them, for the

20  purpose of discoverability, as they arguably could have

21  informed the decision not to hire Mr. -- is it Kascsak?

22  Am I saying that correctly?

23           MS. MOSS:  Kascsak, Your Honor.

24           THE COURT:  Kascsak.  But I do want to be

25  practical in my approach here.  You know, the rules of

1 | civil procedure say that discovery has to be relevant to
2 | the claims and proportional to the needs of the case.
3 |         I think the further back in time you go from
4 | when Mr. Kascsak was applying to Expedia, the less
5 | relevant the internal communications become.  And it
6 | seems to me, although I'm open to be convinced otherwise,
7 | that going back to June 2020 seems to go too far.  I'm --
8 | I didn't dig, I guess, far enough into the record to
9 | understand why that particular date is the starting point
10 | proposed by the plaintiffs.
11 |         I assume the national dialogue around the
12 | George Floyd protests maybe instigated, you know, a
13 | discussion within Expedia that might have some bearing on
14 | some of the policy decisions that were later arrived at.
15 | But I think for our purposes here, one way to narrow the
16 | scope of the search and production and, thus, bring the
17 | burden more in line with the relevance, is to limit the
18 | time frame.
19 |         It seems to me that what matters the most to
20 | this case is what the corporate mind set was at the time
21 | and leading up to the time that Mr. Kascsak applied and
22 | was passed over.  It's not -- that's not to say I think
23 | the cutoff should be April 2023.  But I'm interested in
24 | the parties' input on whether April 2022 is a better, you
25 | know, starting point or maybe January 2022.

1          So that was one thought I had in terms of

2   while, you know, maintaining, maybe the breadth of the

3   scope of the individuals whose communications are at

4   issue here, maybe limiting the scope in terms of time to

5   try and cabin in some of what will be ordered to be

6   produced today.

7          And on that front, I mean, I am likely to --

8   with those observations in mind, I am likely to grant

9   this motion in part.  And I don't need an answer from

10  counsel right this minute, but be thinking about a

11  deadline for any discovery that would be ordered.  I

12  looked at the discovery -- or the scheduling order, and I

13  know that discovery is open until I think middle of

14  December, and dispositive motions are due in mid-January.

15         I think we -- you know, I tend to default to 30

16  days to produce documents.  But, if that's not practical,

17  I'm open to considering more or less time, depending on

18  the parties' input.

19         And I guess, then, I'll go ahead and go RFP, or

20  request by request, and just flag a couple of issues that

21  I have in mind.  And I don't know how the parties have

22  decided to structure their argument on this, but I'm

23  following the structure that was proposed by the joint

24  advisory.

25         As for the discovery, on discovery, I'm sort of

1   torn on this.  I guess right now I'm leaning denying the

2   motion on this part.  But there's also a part of me that

3   thinks it's not too terribly unreasonable for one side to

4   want to know how the other side is conducting their

5   searches just to be sure that -- that large swaths of

6   information are not being missed because of inadequacy in

7   that protocol.

8         But, I mean, both sides are represented by

9   capable and well-respected attorneys, and so I don't

10  doubt that -- I have no reason to doubt the good faith of

11  either side's participation in the discovery process.

12  And what I don't want to do is encourage satellite

13  litigation on the ESI protocol.  But maybe there's some

14  sort of agreed solution here or not.

15        But on RFP 2, the communications between

16  Peter Kern and Lauren von Stackelberg, again, this sort

17  of fits within the broader observation I made before,

18  which I think these topics are discoverable, but maybe

19  only going back to 2022, which might eliminate

20  von Stackelberg from the list since I think she left

21  before then.

22        RFP 3, it's similar.  Maybe the topics

23  themselves are relevant, but maybe limiting the time

24  frame.

25        RFP 9, the company's 2023 diversity report,

1   along with Michael Davis Velasco's discussions around it,

2   you know, I know Defendants say, well, they've got the

3   report now, so what more do you need?  I guess one

4   observation that came to mind for me is that, you know, a

5   corporate pronouncement or public statement of policy by

6   a company is not -- it's not the same as a statute or a

7   contract, as to say that whereas in the latter, in the

8   case of a statute or a contract, you're confining your

9   analysis of the party's intent or Congress's intent to

10  the text on the page.  But when we're talking in terms of

11  a public pronouncement by a corporation about a policy,

12  that may not tell the whole story.  And so I think the

13  communications as they might relate to a discrimination

14  claim might be relevant.  And so that's -- I do tend to

15  agree with Plaintiff on that -- on that front.

16          MS. DASHIELL:  Your Honor, if I may just

17  address one thing --

18          THE COURT:  Yes.

19          MS. DASHIELL:  -- with regard to that one that?

20          That policy was not issued until May of 2024.

21          THE COURT:  Okay.

22          MS. DASHIELL:  So just for the Court's

23  information, I mean, part of it is the 2022 report was

24  issued in the middle of 2023.

25          THE COURT:  Okay.

```
 1              MS. DASHIELL:  During the relevant time period.
 2   But the 2023 report wasn't issued until May of 2024,
 3   which was well after the decisions in this case.  And I
 4   don't know if that makes any difference in your analysis.
 5              THE COURT:  Well, we'll take that up.  I'm just
 6   going to go down my list.
 7              MS. DASHIELL:  Okay.
 8              THE COURT:  Because I don't known when the
 9   communications about the 2024 report were being
10   discussed, and we can get into all that.
11              With respect -- you know, the same sort of
12   discussions about the 2022 diversity report or the
13   predecessor to the most recent one, anyway.  I think the
14   same considerations are in play.
15              With RFP 11, documents discussing hiring
16   criteria for leadership level roles.  I think Plaintiff
17   says that the role of Mr. Kascsak was being considered
18   for or was a leadership level role.  And Defendant
19   responds that we shouldn't have to produce information
20   related to all leadership positions.  I can see that as
21   kind of a close call.
22              RFP 19 it appears is now agreed.
23              And then RFP 20 and 21, with respect to the
24   percentage goals, again, I think maybe limiting the time
25   period addresses some of the scope concerns.  I know
```

1 there is some concern on the part of the plaintiffs that

2 certain custodians were maybe excluded from the search,

3 and so maybe a discussion on that can get us -- get me

4 some answers so that I can maybe rule on that dispute

5 more effectively.

6      But, anyhow, those are sort of my initial

7 thoughts and questions that arose after having reviewed

8 the parties' arguments in the motion and response and

9 then the joint advisory.

10      So, with that, I will have you lead us off,

11 Ms. Moss.

12      MS. MOSS:  Thank you, Your Honor.  And I

13 appreciate your thoughts, and I will endeavor to tailor

14 my remarks in light of that and not spend the time I was

15 going to spend on relevancy, unless there's anything that

16 the Court wants to hear on that.

17      I will talk, then, about the -- the time frame.

18 And we intentionally picked June of 2020 as the time

19 frame.  And to frame this, courts that have looked at

20 discrimination evidence, this is well within the -- the

21 sort of the heartland of how far back they typically

22 allow, anywhere from, you know, two to five years.

23      A case that I think is very much on point that

24 I would direct the Court's attention to that's from this

25 district, from the Austin Division, which is the *Langley*

1  *v. IBM* case that we cite in our -- in our briefs, it's

2  similar to this.  It was a discrimination case.  In that

3  instance it was discrimination -- the allegation was it

4  was age discrimination.

5         But the contention was that IBM's broader

6  corporate policies and pronouncements by IBM's CEO,

7  essentially, that he wanted to see the workforce at IBM

8  become more millennials, that was the impetus to say,

9  look, these corporate pronouncements, you know, when the

10  head of a company speaks, the CEO speaks, people listen.

11         So in June of 2020, what we know -- and you're

12  absolutely right.  I think it was certainly triggered by

13  the events in the country, the killing of George Floyd,

14  Expedia made many public statements.  Its CEO,

15  Peter Kern, issued a CEO action letter.  This was an

16  attachment to the plaintiff's complaint.  It was an

17  action letter that was authored by the former chief

18  people officer, Lauren von Stackelberg, in which they

19  made statements which, to our mind, provide evidence that

20  they were going to be intentionally considering race and

21  gender in hiring.

22         They talked about changing their hiring

23  practices, doing more to -- to address their diversity

24  concerns.  He discussed how everyone in the company

25  needed to be involved in this.  And then this got into

1    their 2021 diversity report.  And it is my understanding

2    that these diversity reports are one year behind, so a

3    2021 report would get published in 2022, but it's dealing

4    with 2021.  And a 2021 report would deal what happened in

5    2020 -- no.  I had that backwards.  I'm sorry.  So a 2022

6    report deals with what happened in 2022, but wouldn't get

7    published until 2023.

8            And so we know that we have these public

9    statements that Expedia was going to sort of change the

10   way it was handling its diversity and hiring, and we

11   keyed it to when those statements were made, which is

12   June of 2020.

13           And I think the IBM case, the *Langley v. IBM*

14   case is a very good example where we have even less

15   evidence of such public statements, and yet discovery was

16   allowed to go back a five-year look-back period.

17           So that is why we asked for the time frame that

18   we asked.  I think we'd have to really look at the

19   discovery that we have to see if that could be pared

20   down.  But I think it would be problematic in that I

21   think the impetus for a lot of this was those statements,

22   the sort of pronouncements by Expedia about how they were

23   going to make these changes which they then began to

24   implement over the course the next, you know, many years.

25           THE COURT:  So I -- I haven't read the *Langley*

1  decision recently --

2           MS. MOSS:  Yes, sir.

3           THE COURT:  -- but I handled a similar request

4  in litigation against IBM.  I don't -- I think it may

5  have been a different group of plaintiffs, but that case

6  involved plaintiffs, plural, right?

7           MS. MOSS:  Yes.

8           THE COURT:  Right.  And so I can see where, if

9  you've got multiple people who allege they were

10 discriminated against over a span of time, maybe that

11 justifies a further look-back period.  But when you're

12 talking about an individual who claims that policies at

13 the time that he was passed over were -- you know,

14 disadvantaged him individually, considering, you know,

15 the corporate world and how quickly the policy, you know,

16 pronouncements shift and focuses on policy concerns,

17 change, you know, on a quarterly basis sometimes, if

18 we're talking about an individual plaintiff, doesn't

19 that, counsel's words, a shorter look-back time?

20          MS. MOSS:  I think my response to that has to

21 be, Your Honor, that whether it's a single plaintiff or

22 multiple plaintiffs, what's important is the source, the

23 alleged source, of the discrimination.  And, again, we

24 believe it began with these pronouncements and the change

25 in how Expedia was dealing with addressing its concerns

1    about diversity -- what it considered to be diversity.

2            You know, its concerns that it wasn't doing

3    enough to have 50 percent representation of women, and

4    that it wasn't doing enough hire 25 percent of what

5    Expedia calls underrepresented individuals, which they

6    have their own definition of who qualifies.  But that's

7    their terminology, is URIs, 25 percent, you know,

8    underrepresented.

9            And it started as we understand it sort of

10   intentionally changing with the pronouncement of the

11   former CEO Peter Kern, in which he issued the CEO action

12   letter and in which he made public statements that they

13   were going to be intentional about making these changes

14   and that they needed to do more.

15           I believe it is around that time that they

16   really started tracking data on the race of the -- the

17   applicant pool and on their workforce.  And so in order

18   to understand what did they intend with these statements

19   and with these policies, you know, the internal

20   discussions and understanding how did they -- how did

21   they intend them to work, how did they -- how did they

22   intend to enforce them through their workforce, how did

23   they change, all of that is circumstantial and

24   inferential evidence that is at the heart and the core of

25   what a plaintiff needs to have access to be able to prove

 1  discrimination.

 2          Another case that I would direct the Court's

 3  attention to, although it is not in this circuit, it's a

 4  Seventh Circuit case by Judge Posner, it's the *Riordan*

 5  case.  And he recognizes in that case the difficulty that

 6  a discrimination plaintiff is going to have coming up

 7  with direct evidence of discrimination because even

 8  defendants of minimal sophistication aren't likely to put

 9  their discriminatory intent down.

10          And so you need to have the ability to

11  understand the background of policies and to obtain the

12  sort of inferential circumstantial evidence.  And since

13  we key it to when the former CEO made these statements in

14  the CEO action letter, that is why we picked that as the

15  start of the discovery date and intentionally limited it,

16  not to everybody in Expedia or everybody in their

17  inclusion and diversity department, but really to these

18  three very limited custodians.

19          We're looking for communications between

20  Peter Kern and Michael David *[sic]* Velasco and

21  communications between Peter Kern and Michael David

22  Velasco's predecessor Lauren von Stackelberg, who was at

23  the time the head of their diversity, their DEI.

24          So, you know, I guess I would -- I would agree

25  that it might be too broad if we were trying to expand it

1  outwards, which I think we do with some of the later

2  requests, but -- that are focused on like the 2022

3  diversity report or the 2023 diversity report, because

4  those are closer in time to the actions that directly led

5  to the plaintiff not being hired.

6       But those -- that request, RFP 2 and RFP 3,

7  they're very limited in scope in terms of the custodians

8  at issue.  And so, for that reason, I would say the start

9  date that we picked is very reasonable, given the reason

10 we picked that start date.

11      THE COURT:  So what more -- I mean, you've got

12 the reports themselves and the public action statement

13 itself that pretty clearly state their intent.  What

14 more, I guess, do you expect to learn from the

15 communications around those public pronouncements and

16 the, you know, drafts of those?  I mean, is it that you

17 might discover even more discriminatory intent than what

18 is on the face of those -- those records?

19      MS. MOSS:  Yes, Your Honor.  I mean, to be

20 clear, we think the public statements are already pretty

21 compelling evidence.  But, as my colleagues said to me

22 today, you need to know how the sausage is made, not just

23 the sausage.  And so that's what we're looking for, those

24 internal discussions around these policies, discussions

25 that they may have had about, well, you know, how do

 1  we -- how do we go about achieving these goals that we've

 2  set.

 3          You know, presumably their public announcements

 4  in our view, as bad as they are, were presumably vetted

 5  before they were made public.  What we want are the

 6  unvetted, the internal communications that are the most

 7  likely source of where we're going to see the actual

 8  intent of these individuals and how they actually

 9  intended to implement these policies within Expedia, not

10  just what they were stating publicly, but what they were

11  stating internally.

12          And I'll move on from the time frame unless

13  Your Honor has any more questions about that.

14          THE COURT:  Nope.

15          MS. MOSS:  So going back to the -- the point of

16  discovery on discovery, I don't think that we need to

17  engage in the debate over, you know, is our conception of

18  what is required under the rules or their conception of

19  what is required under the rules right, because I believe

20  that even under their test for when one can obtain this

21  sort of information, basic information about what have

22  you generally done to comply with your discovery

23  requests, they note, well, if you can point to gaps and

24  deficiencies in the production, that that can be a basis.

25          And there are very large gaps in this

 1  production.  We've already discussed one, which is we

 2  have none, or virtually no, internal communications.  In

 3  the discovery that they had produced in response to the

 4  first set of requests for production, we had only four

 5  emails from Michael David Velasco, one of the most

 6  critical actors or custodians in this dispute.

 7          We had -- we have no drafts or internal

 8  discussions about any of these diversity reports.  We

 9  don't have any communications from Allison Allen, who was

10  the senior vice president over talent acquisition, who

11  would have been the individual to whom the plaintiff

12  would have reported at Expedia.  And we have nothing

13  reflecting what her view -- what her views were in terms

14  of her notes, any emails from her, any discussions

15  between her and Mr. Velasco, any notes that she may have

16  taken from her interviews with the plaintiff.  So, you

17  know, that calls into question the thoroughness of their

18  searches, of course.

19          THE COURT:  Could that be a function of they

20  did the search, but they're withholding them because they

21  determined that it's pursuant to these objections that

22  are the subject of this motion to compel?

23          MS. MOSS:  That is possible.  And I think it's

24  important to understand the context of how we got to this

25  motion to compel.  It starts with the fact that their

1  responses to our discovery were themselves deficient in

2  that they didn't follow the requirements of the federal

3  rules.

4       They responded initially with just pure

5  boilerplate objections, where they said we're objecting,

6  it's not relevant, we're objecting, it's not

7  proportional, we're objecting, it's vague and ambiguous,

8  et cetera.  And the plaintiff, or plaintiff's counsel at

9  the time, wrote back the very next day and said, okay,

10  these are objectionable, provided them with a deficiency

11  letter.  It's an exhibit to our motion to compel.  And it

12  pointed out these problems but then went ahead and

13  narrowed the dispute -- the request to try to address

14  some of them.  And those are the actual requests that are

15  in dispute.

16       Over two months later, Expedia then amended its

17  discovery responses, but it didn't correct many of these

18  issues.  And one of the biggest issues it didn't correct

19  is it did not specify what documents it was withholding

20  based on which objections, leaving the plaintiff having

21  to guess.  Do we not see documents because they're saying

22  they're not relevant?  Are we not seeing these documents

23  because they're saying it's too burdensome?  Are we not

24  seeing these documents for one of their other -- because

25  they're claiming they're privileged?

1           They did not specify, and so they left us

2    guessing, which is part of why we have been attempting at

3    least since I've been involved in the lawsuit to try to

4    get some transparency into, well, what did you do to

5    collect and produce these documents.

6           And it's only after we filed our motion to

7    compel that we've gotten any modicum of transparency on

8    any of this.  And it is now clear, I think, that a reason

9    we're missing a lot of the documents that we're missing

10   is the relevance objection.  That said -- that said, they

11   didn't let us know if they were withholding any documents

12   based on, for example, their proportionality or burden

13   objections.  And they provided absolutely no evidence

14   that this would be burdensome to respond to.

15          And I think the case law is really clear.  If

16   you don't raise these issues, you've waived them.  So if

17   they're going to lose on relevancy, I just want to make

18   sure we're not at a point where, okay, they've now been

19   told they're relevant, that we're now going to have to

20   deal with it's too difficult to produce, it would be too

21   burdensome, it would be too, you know, because they

22   didn't make those arguments.

23          They're -- we're in this position because they

24   strategically chose not to work with us on a set of

25   search terms that would be acceptable, on a set of

1    custodians that would be acceptable.  They chose to do
2    this in a very nontransparent way, contending that they
3    had a right to lock all of this in a block box.
4                That's their choice, but it now brings us to
5    the point where they now can't come forward with that
6    very evidence in an attempt to say it's too burdensome
7    now that, you know, it's been clarified what is in fact
8    responsive.
9                And so, of course, we remain ready to work with
10   them cooperatively if they truly are burdensome, because
11   we want these documents and we want them produced sooner
12   rather than later.  And I'm very concerned that this is
13   going to impact the discovery deadline because we need to
14   get these documents and review them before we can begin
15   the depositions.
16               But, again, you know, this was their choice.  I
17   can't force them.  I'm not trying to dictate to them how
18   they go about collecting and producing their documents.
19   But, in my experience, if you work with the other side,
20   you're more likely to, you know, arrive at an agreement
21   either on search terms or the use of technology assisted
22   review or, you know, other methods.
23               So that's -- I guess that would be my point on
24   the discovery and the discovery point.
25               I believe I've already addressed RFP Number 2,

 1  which is the request for the communications specifically

 2  between Peter Kern and Ms. Von Stackelberg or Mr. Kern

 3  and Mr. Davis Velasco.

 4          THE COURT:  There's a --

 5          MS. MOSS:  Yes.

 6          THE COURT:  There's one point where they argue

 7  that some of these communications might be -- there might

 8  be some privileged -- you know, responsive but privileged

 9  communications for some of these RFPs because general

10  counsel might have been involved in those discussions.

11  Am I right, though, that when it comes to -- if you're

12  just discussing business policies, you can't just CC your

13  GC -- CC your general counsel and shield from production

14  business discussions that aren't truly legal advice,

15  correct?

16          MS. MOSS:  That is -- that is correct.  They

17  did assert a general privileged objection.  My

18  understanding is -- well, they certainly have not

19  produced a privilege log.  I don't know -- so I guess my

20  first point would be, again, I think that is a failure of

21  their response.  They have an obligation, even if they're

22  objecting, to say we are we holding privileged documents

23  that would be responsive but we contend are not relevant

24  but are privileged.  They did not do that, and I think it

25  is too late for them to come in and assert that now.

1          But, of course, I'm at a disadvantage because,

2    without a privilege log, I don't even know the basis

3    for -- you know, I don't know the type of documents that

4    they may be talking about.  If it's just CCs as you said

5    to their general counsel, I don't think that would be

6    privileged.  It certainly wouldn't be work product.  This

7    was years before the dispute in this case.

8          The parties do have an agreement that the

9    communications once the lawsuit was filed between counsel

10   do not have to be logged, which in my experience is, you

11   know, is good for everybody.  So we do have that.  But

12   there are, you know, many -- there's years of potential

13   communications that would not fall under that agreement.

14   We don't have a log.  We have no assertion other than a

15   boilerplate assertion of privilege, which, again, we

16   would submit they've waived by not making it

17   specifically.

18         RFP Number 9, let me get to that.  So RFP

19   Number 9, this is the -- the 2023 diversity report.  And

20   I think Your Honor is right, to the extent they produced

21   whatever ultimately was the 2023 diversity report, they

22   changed its name.  I think they did away with having an

23   independent diversity report.  It's been rolled into a

24   more general report.  But what we're seeking there is not

25   the public documents, but, again, sort of the internal

1  discussions and communications about that document that

2  we think would be far more revealing of, you know, what

3  they were looking at, the date they were looking at, any

4  concerns that they might have about the policies.

5          And, of course, it's the 2023 diversity report,

6  it got published in 2024 but it's dealing with 2023.  And

7  2023 was the year in which the plaintiff was in fact

8  interviewing and then got offered the job but then placed

9  on hold and ultimately didn't get the job.  And so we

10  think it's, you know, very relevant, and, obviously, data

11  from that time frame is very relevant.

12          The requests that go to the 2022 diversity

13  report which would be Request Number 10 and -- well,

14  Request Number 10 that is asking for, really, the

15  documents sent to Michael David Velasco regarding pages 4

16  through 10 of that 2022 diversity report, this is

17  particularly relevant because what we do know from the

18  public report is, at the leadership level where the

19  plaintiff was being considered for a position, that is

20  one area within Expedia that they had explicitly gone

21  down in their URI hiring.

22          And they would have known this, and we believe

23  the documents would show that Mr. Velasco would have been

24  aware of this at the time that the plaintiff was

25  interviewing, got offered the job by Ms. Allen, but then

1    ultimately had the job placed on hold.  And we believe

2    that that happened because of the decision of

3    Mr. Velasco, who would have been very aware that this

4    would hurt those diversity numbers even more if Expedia

5    were to hire a white male to this leadership position.

6    So the 2022 data and information and discussion about it

7    is very important.

8            And all we have received are some data -- some

9    emails with data that was sent to Mr. Velasco.  We have

10   no emails from him to anyone discussing the data, asking

11   questions about it.  We have no notes.  We just have

12   nothing like that.  And, of course, we don't know how

13   they've searched for it, so it's unclear, again, is it

14   that it doesn't exist or is it that they haven't searched

15   for it properly, or does it fall under one of their other

16   objections.

17           Request Number 11 is really in many respects

18   trying to get at the same issue with respect to the

19   leadership level roles.  And that is, again, the

20   plaintiffs have attempted to limit this to only the

21   position that the plaintiff was interviewing for.  But

22   how Expedia dealt with its leadership level positions I

23   think is sort of inferential and circumstantial evidence

24   that's very important in a discrimination case so that,

25   you know, you can see was he treated differently than

1  others at other leadership levels.  You know, was he

2  treated differently than minorities than may have been

3  hired at that same leadership level.

4          THE COURT:  I would imagine, I guess, from a

5  proof challenge you would have if -- if discovery were

6  limited to just that particular position, is once you get

7  to that level and the leadership pyramid of an

8  organization, that there's not a lot of comparators,

9  right?  If you just limit it to that, there's only so

10  many people at his level of position within that section

11  of the organization, you almost need to look across

12  multiple to find how it was being handled at that level,

13  right?

14          MS. MOSS:  I think that's absolutely correct.

15  And potentially, you know, looking at even how not at the

16  leadership level, it may be that we will ultimately need

17  discovery that's broader than that.

18          The other frustration for us has been this was

19  sort of an initial set of discovery requests that we

20  intended to get the ball rolling, to hopefully get

21  discovery, to get documents that we could look at.  And

22  what has happened is we've had to issue many, many, many

23  more requests for production to try to drill down and get

24  at documents that we believe exist or that we see

25  reference to in the documents that we have that have not

1 been produced.

2          And I go back to the *Langley v. IBM* case that I

3 pointed you to, which I think is a very good comparator,

4 and I think in that case they got up -- at least from the

5 documents that are available on the docket, I think they

6 got up to somewhere over 150 RFPs because of a very

7 similar situation, with IBM taking this very narrow view

8 of relevance and the plaintiff having to sort of chip

9 away at that through very specific, contested RFPs.

10          You know, I -- there have been a lot of RFPs in

11 this case, and I'm sure that we'll be serving more.  But

12 it's as we try to get our hands around the documents and

13 the information that is there, because there's, of

14 course, an information disadvantage.  We don't know what

15 they have on how they've organized themselves.  And so

16 these follow-up requests will be coming.

17          But, at least initially with Request Number 11,

18 you know, we're looking for the demographic composition

19 for the leadership level roles from January 1st, 2022.

20 And this is another example where we -- you know, it's a

21 limited request.  We're not going back to June of 2020 in

22 this particular request.

23          Request Number 19, I believe that it's been

24 resolved.  We don't have these documents yet.  We just

25 sort of put a pin in that and reserve the right to come

1  back if it proves to be a problem.  But I believe that

2  they've represented that they're going to produce those

3  documents, so I believe that one is resolved.

4         And then Requests Number 20 and 21, they're

5  really mirrors of each other in that one is dealing with

6  the 25 percent goal for underrepresented and identity

7  hiring, and then 21 is dealing with the gender -- the

8  gender goal.  And they're both keyed to the 2022

9  diversity report.  So there's -- and for the reasons

10 explained, we believe those are relevant.

11        THE COURT:  Will you tell me when -- so the

12 2022 diversity report, when was that published?  And that

13 one covers from data from 2021?

14        MS. MOSS:  My understanding is it covers the

15 calendar year of 2022 and then would have been published

16 in 2023.

17        So, the data showing that they had gone down in

18 hiring at the leadership level at which the plaintiff was

19 being considered for, that their URI hiring had gone

20 down, that is data that would have been available in 2023

21 at the time the plaintiff was being recruited by Expedia

22 but then ultimately not given the job that he was

23 initially offered.

24        THE COURT:  Okay.

25        MS. MOSS:  And, again, it's -- we have the

1  public reports, but what we're looking for are the

2  documents that show how the reports were created and

3  discussions about them, you know, discussions that may

4  have discussed, How do we frame this data?  What do we do

5  in response to this data?  Those are the kind of, again,

6  internal documents, emails, and discussions that we are

7  looking for that have not been produced.

8          THE COURT:  That *Langley* case, it's not -- I

9  don't see that it's in the motion or the reply.  Am I

10  right about that?

11         MS. MOSS:  I -- I believe it's in the reply for

12  sure.

13         THE COURT:  Yeah.  I see it here in this

14  footnote, actually.

15         MS. MOSS:  It might be in the motion, but it's

16  definitely in the reply.

17         THE COURT:  Yes.  I see it.  Thank you.

18         MS. MOSS:  Okay.  I think the only point I

19  guess I'd make, again, on the discovery and the discovery

20  point is, you know, again, we stand ready to confer with

21  them.  So if you want to hold the motion or carry the

22  motion and direct us to confer, we're certainly willing

23  to do that.

24         But it would require them to be more

25  forthcoming about what they've done.  You know, we would

1  have to have a genuine conversation about these are the

2  search terms, these are the custodians, these are the

3  dates, so that we could discuss that's not -- you know,

4  that's not an okay date or, you know, you need to search

5  for -- you know, you need to broaden your search for

6  certain terms.

7          And that's actually one thing that does come to

8  mind, is one of the things that has arisen in our

9  discussions in the meet and confers is their contention

10  that, because Mr. Velasco is the head of their inclusion

11  and diversity team or department, that that makes it hard

12  to identify these documents.

13          And, while I can appreciate that, I don't

14  believe that's a defense.  They choose how their organize

15  themselves.  They've chosen to have a DEI organization.

16  And, you know, we are contending that it's the diversity

17  policies that resulted in these discriminatory actions.

18  So you can't just throw up your hands and say searching

19  for "diversity" is too difficult or searching

20  Mr. Velasco's documents is too difficult because this is

21  what he deals with all day long.

22          That's -- you know, we're certainly willing to

23  work on ways to try to reduce that burden, but they can't

24  absolve themselves of their discovery obligation because

25  they chose to have a DEI department.

1          THE COURT:  Yeah.  I mean, I guess one of

2 the -- I saw one of the arguments in response to we

3 shouldn't have to give discovery on discovery if

4 Plaintiffs haven't identified specific categories of

5 documents that they contend are missing.  But I felt like

6 I saw somewhere in there that there were six different

7 categories of documents that you-all have identified as

8 being missing from the production.  And I think part of

9 the response was, well, just because you didn't get what

10 you expected to get doesn't mean we're not doing a good

11 search.

12          And, again, I almost -- I feel like some of

13 what you might have expected to get maybe would be

14 produced but for these relevance and burdensome

15 objections.  But I guess setting that thought aside, what

16 is your response to the "we've given you everything we've

17 got and it's just -- you know, just because you thought

18 you were going to get this doesn't mean it's there."

19          MS. MOSS:  Sure.  And I think you have to look

20 at some of the types of things that we don't have that

21 are missing.  And I think it has to -- you have to apply

22 sort of a plausibility or a commonsense approach to it.

23          So is it plausible that a sophisticated

24 corporation like Expedia, that has very specific

25 guidelines for how they're going to interview

1 individuals, how they're going to track them, the notes

2 that they keep on those -- they call it looping, that he

3 was looped through, and the individuals, that despite

4 that, there is absolutely no documentation for

5 Mr. Velasco or Ms. Allen related to their interviews of

6 Mr. Kascsak, of the plaintiff.  There's no notes, there's

7 no emails, there's no discussions between Ms. Allen and

8 Mr. Velasco.

9       And because they also will not tell us what ESI

10 sources they collected or how they were preserved, we

11 don't know if they're missing, again, because of a

12 failure of search terms, a failure of collection of ESI

13 sources.  We just don't know.  But it's not really -- if

14 we knew that, then, yes, we might be able to say, okay,

15 well, then it looks like, you know, they just don't

16 exist.  But we're left guessing because of the way they

17 chose to approach discovery, by making these broad

18 objections and not specifying kind of what they did in

19 response to the discovery.

20       We also don't have emails that we know Expedia

21 sent to the plaintiff, because we have them and we've

22 produced them, but they're missing.  That is another, you

23 know, sort of indicator or red flag about -- about their

24 thoroughness of their search or preservation.  We don't

25 know which.

1          We know that we are lacking any documentation

2   that explains why, after verbally giving Mr. Kascsak the

3   offer, they then put him on hold.  We know what he was

4   verbally told, and that seems to be pretextual.  But it

5   sort of dies with a written offer being prepared for him

6   where they were discussing his salary and then nothing,

7   no communications at all, internal communications, from

8   that point.

9          We also know that lacking from their production

10  are any explanation as to why, after having told him that

11  they weren't hiring and they were putting the position on

12  hold, that they in fact reposted the position and were

13  hiring for it.  No explanation for why they did that, no

14  internal documents that have been produced about that,

15  and no documents which explain why they then decided to

16  call the plaintiff back to New York in July of 2023.

17         Lacking -- we've already discussed the

18  firsthand materials from Ms. Allen meeting with the

19  plaintiff on August 15th of 2023.  We know that we are

20  lacking any official materials showing why Expedia

21  decided not to hire the plaintiff.  You know, we now have

22  the explanations they're giving in the litigation, but

23  there's sort of no formal -- and maybe they don't keep

24  their documents this way.  But that is also part of why

25  we have asked for comparator documents to see.

```
1              Nothing to show why the decision was ultimately
2    made.  Again, nothing from Ms. Allen at all, nothing from
3    Mr. Velasco at all.  As noted, only four emails from
4    Mr. Davis Velasco have been produced.
5              We have asked for -- we've been told that we
6    have all of their training materials.  But we've asked
7    specifically for a presentation that we know that
8    Ms. Allen gave in March of 2023.  We know from a letter
9    that her counsel sent to Expedia, when she was let go
10   from Expedia at the end of 2023, in which she alleged
11   that she was very concerned about this -- this
12   presentation, that she was forced to come in and defend
13   Mr. Velasco's diversity policies that she didn't agree
14   with and thought were unlawful.  We've asked for copies
15   of what presentation was given, notes about that meeting.
16   None of that has been produced.
17             And I should be clear.  That request was
18   following -- it was not in this -- for that specific
19   presentation, that isn't in these RFPs.  It was a
20   follow-on RFP we made because we've been told we had
21   everything, and we have reason to believe that's not
22   true.  So that's another example of something that was
23   missing, and we don't have a great explanation for it.
24             In this letter that Ms. Allen's lawyer sent to
25   Expedia, there are discussions -- it references
```

1    discussions that Ms. Allen apparently had with

2    Mr. Velasco in which she, quote, offered some legal

3    avenues to achieve diversity, end quote.  But that,

4    quote, Michael remained strident in his position that the

5    racial identity of new hires must match an explicit quota

6    set before anyone was interviewed or hired, end quote.

7            We have no communications between Ms. Allen and

8    Mr. Velasco, and certainly not discussing those topics.

9    We have no communications between -- we have no chats.  I

10   shouldn't say not just communications.  We have no

11   emails, we have no chats.  They use Slack chat,

12   apparently.  We have none of that between Mr. Velasco and

13   Ms. Allen.  We have no text messages.

14           It just, again, maybe these things don't exist.

15   But I think the Court can apply a sort of rule of reason,

16   a commonsense plausibility to say:  Are these two

17   executives who are having these important discussions

18   that, by the way, work -- one works in Washington, one

19   works in New York, they're not in the same office, this

20   is a tech company, these are busy executives, to suggest

21   that there are no written communications between them?

22   That just doesn't seem plausible.  Maybe at the end of

23   the day that will prove to be true, but it certainly

24   raises, I think, a very legitimate question about their

25   productions.

1          And we also know that documents likely exist

2    regarding compensation provided to Expedia employees

3    based on their meeting or complying with race- and

4    sex-based hiring quotas, which we've been told that

5    doesn't happen, it doesn't exist.  But we know, based on

6    Expedia's public 2020 diversity report, that references

7    referral bonuses that are going to be paid to Expedia

8    employees to meet these quotas.

9          And so, again, you know that is a source of

10   information.  Maybe it was withheld based on the

11   relevancy objections because it's from -- it would have

12   been from 2020.  And I would add that's another reason

13   why I think the June of 2020 date is an important

14   relevant date.  But these are just examples, and I'm sure

15   I can come up with more, of holes or missing information

16   from their productions that warrants requiring them to be

17   more transparent.

18          MS. MOSS:  Thank you, Your Honor.

19          THE COURT:  Thank you, counsel.  Ms. Dashiell?

20          MS. DASHIELL:  Thank you, Your Honor.  If I

21   could first orient the Court a little bit.  We responded

22   to 93 requests for production over five sets.  We've

23   produced over 30,000 documents.  We have produced -- the

24   discovery thus far has been extensive, a lot more

25   extensive than Plaintiff's counsel argues.

1          And I think it would be helpful for the Court

2    to understand a little bit -- I know you've read the

3    complaint.  I know you're familiar with the plaintiff's

4    allegations.  But if you could allow me to explain just

5    the backdrop to understand the relevant scope of the

6    people involved in this, I think it would be helpful.

7          So Michael Kascsak applied for the senior

8    director global sourcing position.  It was a new

9    position.  Expedia's sourcers reviewed over 300 resumes

10   for the position.  They had intake interviews with 44

11   individuals, and about 12, 13 individuals were hired --

12   made it to a manager, a hiring interview.  All of those,

13   including Mr. Kascsak, were rejected for the position.

14   They included male, female, diverse, white, the whole

15   group.  So it's not just Mr. Kascsak.  So that's a group

16   of about 15 employees.

17          The position remained open from 2023, when it

18   first opened up, to 2024, to this summer, when

19   Patrick Sullivan was hired for the position.  And one

20   thing I would like to correct, because I do think it

21   bears mentioning, is that Plaintiff's complaint claims on

22   information and belief that Bernita Dillard, a black

23   female, was hired for the position.  And that's

24   categorically false.  Ms. Dillard was never hired for the

25   position.

1          Apparently, this information came to the

2    plaintiff through someone who did not work at Expedia.

3    So it came through the rumor mill, so to speak.  But what

4    the documents show that were produced is that

5    Ms. Dillard, who is current Expedia employee, was never

6    considered for the position, was never interviewed for

7    the position, and obviously wasn't hired for the

8    position.

9          And so, briefly, I'd like to on the next slide

10   talk -- this is just simply the timeline.  I think you're

11   familiar with it.  The relevant timeline in terms of

12   Mr. Kascsak's experience -- I'm sorry -- Kascsak's

13   experience at Expedia is April to August of 2023.  And

14   then on the next slide, I think it's important for the

15   Court to understand the universe of people that were

16   involved in the hiring process.

17         And so key is Allison Allen who was the senior

18   VP of global talent acquisition was the person

19   responsible for hiring and the person who made the hiring

20   decision.  She responded -- or she reported to

21   Michael Velasco, who is the chief people inclusion and

22   diversity officer.

23         Now there's been discussions about what

24   documents.  So Mr. Velasco, his sole involvement in

25   Mr. Kascsak in terms of meeting him is he interviewed him

1    by video in May of 2023.  The sourcer reached out to him

2    asking for his feedback.  He gave written feedback on

3    that interview, which has been produced.  So it's not --

4    it is not true that there's been no feedback from him

5    produced.

6            He then had communication with Tim Cox,

7    Expedia's HR director, about the compensation

8    requirements that they would have to -- have to pay in

9    order to get Mr. Kascsak.  Those communications have been

10   produced.

11           Mr. Kascsak -- the individuals on the right are

12   all of the individuals who interviewed or had a meeting

13   with Mr. Kascsak and who presented feedback to

14   Allison Allen.  Every document that has any of that

15   feedback, any statements, this universe of people,

16   Christina Lochard and Kristin Stencil, they were admin

17   individuals who had some communications with Mr. Kascsak

18   in terms of scheduling, et cetera.

19           This is the universe of people that we have

20   performed exhaustive searches for every version of his

21   name, global sourcing, sourcing, and produced every piece

22   of paper, internal and external, that references either

23   him or the hiring for this position.

24           You know, obviously, what we've objected to is

25   doing searches of Peter Kern's emails or Lauren von

1    Stackelberg.  Ms. Stackelberg left the company in April

2    of 2021, a full two years before Mr. Kascsak ever

3    interviewed.  And I'm sure it comes as no surprise that

4    Mr. Kern was not involved at all in either Mr. Kascsak's

5    interviews or in the hiring of this position.  And if he

6    had -- if he had had those communications with

7    Mr. Velasco or, frankly, with Ms. Allen, they would have

8    been caught by our searches and produced.

9             And so going to the next slide -- keep going.

10   Go to the box slide.

11            Just to summarize kind of the progression of

12   discovery here, all feedback and communications regarding

13   Mr. Kascsak have all been produced: Slack messages

14   emails, et cetera.

15            And, you know, I know this issue is an

16   important issue to Mr. Kascsak, but it is one hire, one

17   person interviewing, for one position at Expedia.  And so

18   Plaintiffs want to point to what they say are gaps in

19   production.  The only gaps that they identify in their

20   pleadings, apart from all of the ones that they've now

21   described to the Court that I couldn't keep track of,

22   were -- are around that there's not enough written

23   communications around this offer.

24            And so, for example, on page 5, Docket 50,

25   which is either -- I think it's their motion, they say

1   there aren't any materials reflecting why Expedia decided

2   not to give Plaintiff the written job offer prepared for

3   him in May 2023.

4           Well, just because that document does exist --

5   has not been produced does not mean it does not exist.

6   There is a reference, for example, to a phone

7   conversation between Allison Allen, who is responsible

8   for the hiring, and Christensen, who was preparing the

9   offer saying:  Please hold off on seeking approval of

10  this offer until we talk, period.

11          And so they have not produced -- and the

12  others, it's similar.  They say there are no materials

13  describing the follow-up conversations that Expedia had

14  with Plaintiff in late May of 2023 regarding that offer.

15  There's various Slack messages.  There's various emails

16  and different things with Plaintiff.  But, again, just

17  because they say that there's -- there's no documents

18  doesn't mean they exist.  They would have been caught.

19          And so what you see is, in order to -- in order

20  to order what is an extraordinary remedy of discovery on

21  discovery, the Texas courts have made it clear that the

22  plaintiffs have to show a material gap in production.  It

23  is not sufficient to do what they've done here and say,

24  well, we speculate that there should be other documents.

25  That's simply not enough for a court to order this

1  extraordinary remedy.

2           The other evidence that plaintiffs -- or the

3  other argument the plaintiffs point to in connection with

4  this discovery on discovery is that there are gaps.  And

5  I think, Your Honor, you were right in pointing out that

6  there are documents that we have not produced based on

7  our scope objections.

8           And I think it's important for the Court, to

9  the extent necessary, to review those -- those

10  objections.  They were -- they're on Docket 50-2.  And

11  what's clear -- and I have an excerpt here if the Court

12  wants to see it?

13           THE COURT:  Sure.

14           MS. DASHIELL:  May I approach?

15           THE COURT:  You may.

16           MS. DASHIELL:  All this is is 52 with our

17  objections highlighted for the relevance.  So I pulled

18  out all the extraneous passages.  And *[unintelligible]*

19  sent this yesterday, but here's a copy.

20           Except I took my copy, I think.  Let me grab

21  that back from you.

22           So what this shows, Your Honor, is that Expedia

23  was clear in terms of what it was producing and what it

24  was not producing in response to Plaintiff's discovery

25  requests.  And so, for example, if you look at page 7,

1   which is the third page of this, in response to Request

2   For Production Number 2, Expedia made its objections and

3   then, in response, stated:  Expedia has produced the

4   policies on diversity and inclusion during the relevant

5   time period and has also performed a reasonable search

6   for communications from Velasco referencing either

7   Kascsak for the global sourcing role and produced the

8   documents responsive to that search.

9           So Expedia has been clear throughout in terms

10  of what they're producing and what they're objecting to.

11  So the -- the fact that there are -- there are other

12  documents that exist that have not been produced is not

13  any evidence of a gap that is sufficient to order

14  discovery on discovery.

15          THE COURT:  I'm curious why -- why resist the

16  request for more details on your discovery protocol.

17          MS. DASHIELL:  I understand, Your Honor.  We

18  have produced some information, and so there has been

19  some back-and-forth.  I think the history of this case

20  has made it difficult in that, you know, Plaintiffs want

21  to say, well, this is typically discussed in a 26(f)

22  conference.  Different counsel, not this counsel here,

23  were involved in that conference.  They didn't bring it

24  up, they didn't ask.  We talked about it.  We had a

25  general discussion about electronic discovery:  Is there

1  a certain form that you want our discovery to be

2  produced?  Should it be a load file, should it be TIFFs,

3  et cetera.  But it simply didn't come up.

4          They didn't offer that information to us, we

5  didn't offer that information to them, and they did not

6  ask.  And so this only came up later, after we had

7  already responded to these numerous discovery requests.

8          Second, what I would say is, one, it is clear

9  what custodians have been searched.  We have provided a

10  list of custodians.  And what we realized late in the

11  process, when plaintiff's counsel brought it to our

12  attention, is that our load files did not contain

13  custodian information.  And they asked for that

14  information, and I think within a day or two we provided

15  an overlay that states the custodians for all of the

16  documents we produced.

17          But going to your question, the problem is not

18  just that Plaintiffs want to know what we searched.

19  We've provided some of that information, and we're happy

20  to continue conferring on that.  And I think we will have

21  to because some of these requests are so broad that we'll

22  have to come to some agreement about searches.

23          But the problem is that we responded to 93

24  requests for production.  And if you read Plaintiff's

25  request for Interrogatory Number 22, it asks for each --

1   for us to detail each and every effort we took related to

2   all of those requests.  And so it was not a targeted

3   request.  It was not, you know, we think we're missing a

4   document that's responsive to request X.  Can you provide

5   us some information on that?  When they've made that

6   request, we've provided that information.

7          And we have asked them several times, look, if

8   there's a gap, if you think I don't have all of the

9   communications between Allison Allen and Michael Velasco,

10  we will do another search and we will provide you that

11  assurance.  In fact, in request for production -- in

12  their second set, they made a lot of those requests.  And

13  so it was clear they were trying to get to, do we have

14  everything.  So it was produce every Slack message

15  between Allison Allen and Sarah Sanderson these dates.

16  We answered without objection, we ran those searches, and

17  we provided those assurances to them.

18          And so -- so part of the problem is this

19  wholesale, just produce us this information related to

20  every request, is overbroad.  Now, if they meet their

21  burden, if they bring -- or even if they don't meet that

22  burden, but they come to us and say, hey, we don't think

23  we have all the communications from Michael Velasco, we

24  can say, We'll tell you what we searched.  We searched

25  all of his Slack messages, we searched all of his emails,

1    and this is what we searched for.

2            But second problem with it, Your Honor, is that

3    it's not just -- and we heard reference to this from the

4    plaintiffs.  It's not just that they want to know what we

5    searched for, but they want to step across the aisle and

6    insert themselves into our process.  So they want to get

7    that information and come to us, without any evidence

8    that there's a gap or that it was insufficient, and say,

9    you know, I don't think that's sufficient.  I think you

10   need to go back another six months, or I think you need

11   to add the term "diversity" instead of "diverse."  I

12   mean, they want to micromanage those searches.

13           And I will tell you, Your Honor, we have --

14   this process has been extensive in terms of time and in

15   terms of cost.  I mean Plaintiff's cases, unfortunately,

16   they're very -- they're uneven, right?  So you have a

17   commercial case, and you have two commercial parties and

18   they both have a lot of documents in there.  They're

19   sending cannonballs across the aisle to each other.  But

20   they're inherently constrained because they know, if they

21   overreach and send too many of those, they're going to

22   feel the pain themselves.

23           But in employment cases, unfortunately, all of

24   the documents, virtually all of the documents, are held

25   by the defendants and the burden is all on the

1   defendants.  And so the plaintiff can -- can sit in their

2   office and, in the course of a couple of hours, send

3   request after request after request, which places a huge

4   burden and expense on the defendants to talk to the

5   custodians, draft the search terms, search all the

6   relevant ESI, gather the ESI, send it to the third-party

7   vendor, have that vendor process that data.  Only then do

8   you get to start searching through that data and

9   reviewing the documents, which always have a crazy number

10  of hits that have nothing to do with the case.

11          And so that's why I think proportionality is

12  very important in employment cases, in particular because

13  of the potential for abuse in that inherent, uneven

14  playing field.

15          You know, I will point out in this case the

16  plaintiff has eight lawyers on this case.  It's a

17  single-plaintiff attorney case -- a single-plaintiff

18  employment case with eight lawyers, two of whom are with

19  America First Legal, which is a group founded by

20  Stephen Miller, that has as its goal and mission to fight

21  back against the radical left and save our country.

22          And while they're perfectly -- it's perfectly

23  within their right to represent Mr. Kascsak and their

24  interests are aligned to some extent, but they have the

25  potential to diverge.

1         And so I think it's important in this case to

2    really focus on the proportionality aspect and remember

3    that Rule 26 requires it to be materials that are

4    relevant to this case, to Mr. Kascsak's case, and not

5    simply an attack on DEI policies.

6         THE COURT:  Well, I think the plaintiff here

7    has done a good job of pleading -- one that survived a

8    motion to dismiss, but pleading a factual basis for a

9    claim that is based on a corporate-wide policy that

10   extends beyond just the individual considerations of his

11   hire, right?

12        I mean, that's the whole basis for his claim,

13   is there was this company-wide pronouncement and I --

14   that I'm a victim of.  And so I think that -- that

15   framing of the issue, and it's a live claim right now,

16   seems to take it outside of some of the examples of the

17   case law that I saw in the cases you had cited where you

18   really could refine the scope of what was relevant, I

19   think, more so than you can here.

20        MS. DASHIELL:  Yeah.

21        THE COURT:  Because it is but-for causation.

22   It is sort of a company-wide pronouncement.

23        MS. DASHIELL:  And I understand that,

24   Your Honor.

25        And -- Brooke, could you go back to that box

1    side?  Is that what we're on?  Yes.

2            I think it's important that we have not limited

3    discovery to just anything involving Mr. Kascsak.  And so

4    to get back to my slide, we've also produced feedback,

5    communications, et cetera regarding every other candidate

6    who applied for the position, and all of the interview

7    notes, et cetera, involving all of those candidates.

8            But, third, we have produced all of Expedia's

9    I&D policies, but not just their policies, all of their

10   training materials, all of their informational materials.

11   Ms. Moss mentioned wanting to know how these policies

12   were going to be put in play.  They are -- they're

13   explained in these documents.  And this is -- you know,

14   we didn't produce one piece of paper.  I mean, this is a

15   combination of policies, fact sheets, numerous slide

16   decks, throughout time talking about these policies.

17           But you can see this is what we've produced for

18   the relevant time period, and this captures things that

19   were being exchanged back and forth in 2023.  You can

20   imagine what it's going to look like if we have to search

21   and review for all of those materials reaching back all

22   the way to 2020.

23           Which is why I think the Court's suggestion

24   that an appropriate cutoff for discovery is 2022 is one

25   that really takes care of many, many -- the majority of

1    our disputes in this case.  Because including that '20

2    and '21 -- '21 time period exponentially increases the

3    amount of documents that we have to search for and

4    review.

5            THE COURT:  Even if it's just with respect to

6    two or three people in the organization?  Because that's

7    one thing that they point out.  It's, like, we're not

8    asking for communications from everybody back to 2022.

9    It's Peter Kern, it's Ms. Von Stackelberg, it's Michael

10   Davis Velasco.  It's just those three people.

11           And so, yeah, we want to go back further.  But

12   for the requests where we want to go back to June 2020,

13   it's a more limited custodian request.

14           MS. DASHIELL:  It would still be a huge number

15   of documents.  This is the time period as when, as you

16   said, I mean, I think let's talk about Peter Kern's

17   involvement.

18           THE COURT:  Well, I want to pose a question

19   before you get into that.

20           MS. DASHIELL:  Sure.

21           THE COURT:  Have you done a search to show just

22   how huge that number would be?

23           MS. DASHIELL:  We have not run that particular

24   search.  We ran a search of other custodians.  And it was

25   at the plaintiff's request, but of other custodians.  It

1    did not include Mr. Kern.  It did not include Ms. Von

2    Stackelberg.  But it was -- it was more of the custodians

3    of people going all the way back to 2020 for these terms

4    that they want us to search for: race, sex, male, female,

5    diverse, et cetera.  And after it was processed, it was

6    30,000 documents.  That was the result of that search.

7           I think here one of the issues is Ms. Von

8    Stackelberg has been gone from the company for three

9    years now.  She was gone from the company two years

10   before Mr. Kascsak was ever hired.  So how is anything

11   that she said relevant to the decision that was made

12   regarding Mr. Kascsak in 2023?

13          And I think with regard to Mr. Kern, it's

14   similar.  I mean, I will tell you that Mr. Kern's only

15   involvement that they've been able to point to is that he

16   issued this letter in 2020 which they say was shocking

17   and it shows discrimination.  This was an open letter

18   that every CEO in the company was issuing in the wake of

19   the George Floyd murder.

20          And the specific sentence that they -- they

21   take words from and quote to was:  What matters is that

22   we humans reject the killing of innocent people and the

23   systemic racism that has plagued our country.  He then

24   goes on to say:  Hundreds of years of racism and overt

25   and conscious bias will not be fixed with a vaccine.

1    Instead, we must be part of a solution, and we each must

2    rededicate ourselves to the cure.

3         Those statements are very different in the

4    statement in *Langley* where they bragged, you know, we're

5    going to hire 50 percent millennials.  Those two

6    statements are very different.

7         Having said that, if we limit the searches to

8    2022 forward, let's -- I mean, Plaintiff's point really

9    to two buckets in support of their claim.  They say there

10   were discrepancies in the events and communications in

11   connection with Mr. Kascsak's hiring.  You know, there

12   was a delay, different communications, et cetera.  All of

13   those have been produced.  We've run exhaustive searches

14   on all of those.

15        But then, as you know, they point to our

16   policies.  All of these policies have been produced, and

17   all of the training materials and other materials related

18   to those policies have been produced.  They say those

19   policies on their face prove their case.  And they have

20   those.

21        But then really what they focus on are

22   Expedia's hiring -- you know, aspirational hiring goals,

23   that they want to achieve a 50-50 gender balance and

24   25 percent URI representation, which is underrepresented

25   individuals.

1          And so with regard to that, not only have we

2    produced all these policies which contain Expedia's

3    progression towards those goals, we've produced materials

4    that Mr. Kascsak was receiving within the time period

5    showing that information.

6          So, for example, Mr. Kascsak was receiving

7    monthly summaries.  Oh, I'm sorry.  Thank you.

8          Mr. Velasco was receiving monthly summaries

9    regarding that data, and we produced all those

10   communications.  We also ran some searches.  But if

11   during 2023, and even during 2022, Mr. Kern was

12   communicating with Mr. Velasco and saying something like,

13   Wow, it's really important this year that we meet this

14   hiring goal; you need to do everything you can to meet

15   that, we're willing to run those searches and try to

16   discover those documents.  But going back to 2020 and

17   2021 seems too far outside the bounds of what would be

18   relevant.

19         2022 and '23 communications between Mr. Kern

20   and Mr. Velasco, yes, I agree with the Court, especially

21   with regard to those diversity metrics that we're talking

22   about.  But, again, cutting it off at 2022, but including

23   Mr. Kern and his communications with Mr. Velasco from

24   that point forward, seems to strike a good proportionate

25   balance.

1           With regard to the specific requests, I have a

2   few comments.  Request for Production Number 2, again, I

3   think if the Court limited that to 2022 forward, I think

4   that would go a long way toward making that a proper

5   request that we could work to try to capture those

6   documents.

7           THE COURT:  So a question.  It's one I posed to

8   Plaintiff's counsel as well.  But maybe I just have an

9   ill-informed assumption here, but a big, advanced

10  technology company like Expedia -- myself, I worked at

11  Dell for five years before I went to law school, and the

12  initiatives of that company and the metrics of every

13  little thing that could be quantified were reported.  And

14  policies and priorities changed on a quarterly basis,

15  and, you know, what was a big deal in Q1 of 2001 was, you

16  know, old news by Q3 of 2001.

17          Part I guess of my thinking here is that it's

18  clear that Expedia and a lot of companies had

19  diversity-related concerns and pronouncements and

20  corporate statements in that June 2020 time frame, but

21  how they were acting on some of those policies that might

22  have been articulated two years before certainly changed.

23          MS. DASHIELL:  Uh-huh.

24          THE COURT:  I mean, might have evolved for

25  better or worse, depending on how you look at it, two

1  years later, one would think.  And, I mean, am I right

2  that it's that -- it's the corporate mind set and the

3  communications around those policies in the year, year

4  and half leading up to the hiring decision as opposed to

5  the three and a half years leading up to it, are more

6  relevant to what the jury needs to consider when they're

7  thinking about did this violate the law?

8          MS. DASHIELL:  We would agree with that,

9  Your Honor.  You know, we've produced, and they're

10  publicly available, the inclusion and diversity reports

11  for 2020 and '21 and '22 and on.  So we've produced some

12  of those early reports.  And those kind of set forth the

13  programs.  And those reports and the documents we've

14  produced are extensive in terms of how are you going to

15  do this.  Well, they spent a lot of time describing how

16  they're going to do that.

17          We're going to -- I mean, I think that this

18  whole red rope can be summarized with what they always

19  refer to as the top-of-the-funnel argument, which you may

20  have heard a similar description, which is ultimately the

21  goal was:  We want the top of the funnel in terms of

22  hiring.  We want to make sure that the top of the funnel

23  is open and free from bias.  And so we want to make sure

24  that everyone -- black, white, male, female -- has an

25  opportunity to interview for these positions.

1            And so all these policies set forth in here are

2    we're going to do outreach.  We're going to go to

3    AfroTech, we're going to invest in -- in tech so that we

4    have a broader pool of applicants.  But what they say

5    over and over in those policies is:  When we get to the

6    bottom, when it comes to the hiring decision, that

7    decision must be made on competencies, not identity.

8            THE COURT:  Well, the public statement on that

9    policy might say that.

10            MS. DASHIELL:  Sure.

11            THE COURT:  But who knows what they're saying

12    in the emails.

13            MS. DASHIELL:  Who knows what they're saying

14    otherwise.  But to your point, Your Honor, I don't think

15    what they were saying about that, especially what people

16    who were not involved in this decision were saying about

17    that in 2020 or 2021, is relevant.

18            Now, if you go to 2022 forward, I mean, again,

19    their focus is on, look, there was a big press to meet

20    these diversity metrics.  And so we've produced documents

21    talking about that and discussing that, that set forth

22    where Expedia was with regard to those metrics.  And

23    based on -- on the rulings, we will do more -- you know,

24    we are willing to do more searches for those types of

25    documents.

1          And so I think that -- again, I think that

2 strikes the balances.  What doesn't -- what matters is

3 what policies are in place.  But then what the company

4 was looking at and what the decision-makers and even, for

5 example, Mr. Kern was looking at in terms of data,

6 et cetera, in the -- in the time period leading up to

7 this hire.  Because, again, they publish these statistics

8 on a yearly basis.  They have access to them on a monthly

9 basis.

10          But what communications there -- what's

11 relevant and what they'll be pointing to is not what

12 Laura [sic] von Stackelberg said in June of 2020.  I

13 don't think that would even be admissible evidence.  But

14 what they would want to point to is what was Mr. Velasco

15 saying in 2022 and 2023.  And to the extent they want to

16 try to go there, what was Mr. Kern saying in 2022 and

17 2023.  Does that answer your question?

18          THE COURT:  Yes.

19          MS. DASHIELL:  Okay.  So, again, in terms of

20 Request for Production Number 2 and Request for

21 Production Number 3, limiting that to 2022 forward

22 strikes the proper balance and would save us from getting

23 those huge hit counts, I would hope.

24          Request for Production Number 9, you know,

25 again, this was a report that came out in May of 2024,

1  which was the basis for -- we produced the report itself.

2  You know, the decision was made regarding Mr. Kascsak

3  well before that.  But, all in all, in terms of what

4  Michael Velasco said about the document, I think we would

5  be willing to grant them some leeway on that.

6          Request For Production Number 10, you know,

7  the -- the difficulty we've had with this request is the

8  wording of it, specifically regarding the "any of the

9  information on pages 4 through 10 of the 2022 Expedia

10  diversity report."  And so I posed several times, and

11  we've had some back-and-forth, regarding what does that

12  mean?  What is the scope of that request?  Because our

13  initial understanding of the scope of that request was

14  all documents sent -- and, again, it's sent to

15  Michael Davis Velasco regarding this information, which

16  is the statistical information.

17          And so, internally, we did some investigation,

18  we did our duty, we went and talked to the witnesses and

19  said:  What were you receiving regarding these

20  statistics?  And we discovered and located and produced

21  that he was receiving monthly reports regarding those

22  statistics.

23          But I guess I hesitate, and the reason we

24  had -- it's just difficult to understand what does

25  "regarding any of the information on pages 4 through 10"

1  mean.  I had proposed some language that if it was

2  changed to, "sent to Michael Davis Velasco that discuss

3  or reference the data that that is contained on the pages

4  of the report," you know, something so that I have a

5  better understanding of what that means.  Because, in our

6  mind, we answered it and have produced all responsive

7  documents.

8         With regard to Request For Production

9  Number 11, similar.  It is -- it is completely unclear to

10  me what is meant by "produce all documents which discuss

11  or describe hiring criteria or hiring guidance for other

12  leadership positions."

13         That potentially opens a whole world of

14  documents.  What do they want?  Do they want us to have

15  to produce what we did for Kascsak in terms of all of the

16  applications, interviews, et cetera for those positions?

17  I mean, what do they mean?  There's been no attempt to

18  identify a similarly -- whether these people were

19  similarly situated individuals.

20         I mean, I get the demographic information

21  regarding the percentage hires and things.  That was our

22  read of it.  But our objection was to the hiring criteria

23  and hiring guidance.  I don't know how to comply with

24  that.  And to the extent, which it sounds like from

25  Plaintiff's counsel, to the extent that means that they

1 get to conduct broad discovery into all of Expedia's

2 hires for leadership positions, I think that's clearly a

3 bridge too far.  They would first have to make a

4 threshold showing that there's another similarly situated

5 individual.  And while the aggregate data regarding

6 leadership hires is a fair topic for discovery, the

7 details of each and every hire would be well outside the

8 scope.

9         Regarding Request For Production 19, we've

10 agreed to produce that data.  It will probably have to

11 be -- anyway, she's on her honeymoon.  So that's coming.

12         Request for Production Number 20 and 21, again,

13 we've had a little bit of shifting.  What happened in

14 this case is they sent us a request for production, we

15 sent objections, and then they sent amended requests,

16 which we didn't respond to again.  We were already

17 responding to the second, third, fourth, fifth.  It was a

18 little unusual.

19         And so, I mean, our position all along is that

20 we have produced the written plans, instructions,

21 strategies, or reports detailing how the company intended

22 to plan to meet its 25 percent goal.  I mean, those are

23 set forth in all of these documents.  And so it's not a

24 specific request for communications.  And, if it is, it's

25 not -- there's no -- it doesn't list the universe of

1  people, et cetera.

2          And so I think we believed that we complied

3  with responding to the request, which was for written

4  plans, instructions, strategies, or reports.  And there

5  have been plenty of other requests that have asked for

6  communications and things that we've -- some that we

7  talked about and some that are in future requests.  But I

8  think if the plaintiffs want something outside of this,

9  they need to send a specific request for that so that we

10 can best respond.

11         Did Your Honor have any other questions?

12         THE COURT:  Let's say I grant the motion along

13 the lines of kind of what I talked about earlier with a

14 2022 cutoff.  What do you think would be a reasonable

15 time for you to produce responsive, nonprivileged

16 documents?

17         MS. DASHIELL:  I think 30 days would be

18 difficult, Your Honor.  I understand that we're bumping

19 up against a discovery cutoff which makes this difficult.

20 But I've had these discussions that -- and, as you know,

21 it's a multistep process.  You know, we craft the

22 searches -- just so you understand how it works here,

23 Expedia runs the searches.  They then export that data to

24 a third party.  The third party then needs to process

25 that data.  And so it takes up to a week, 10 days, before

1   there's even something for me to review.  And then that
2   review has to commence.
3           We would ask for at least 40 days.  But for the
4   discovery cutoff, we would be asking for 60 days.  But we
5   will ask for 45 days.
6           THE COURT:  Okay.
7           MS. DASHIELL:  And try very hard to get it done
8   in that time period.
9           THE COURT:  Okay.  Anything else you'd like for
10  me to consider before I hear from Plaintiff in rebuttal?
11          MS. DASHIELL:  No.
12          THE COURT:  Thank you.  Ms. Moss?
13          MS. MOSS:  Just a brief response.  Well, maybe
14  not so brief, but a response, Your Honor.
15          I'd like to take another stab if I can at the
16  timeline, and specifically Mr. Kern's and Ms. Von
17  Stackelberg's involvement in this.
18          And we don't dispute that they obviously were
19  not directly involved in interviewing the plaintiff or in
20  ultimately making the decision not to hire him.  But they
21  were involved in creating the policies that led to the
22  discrimination that caused him not to be hired.
23          And, again, we have statements -- and they went
24  past them in their presentation, but they on a couple of
25  their slides highlighted the CEO action letter in which

1  Mr. Kern made -- and this was a CEO action letter that he

2  signed, so he's embracing this on behalf of the company,

3  but it was drafted, as we understand, by Ms. Von

4  Stackelberg.  So that is the connection between both of

5  them.

6           And he talked about not just, oh, we should all

7  be appalled and shocked at the killing of George Floyd.

8  That wasn't the impetus.  It was specifically with

9  respect to Expedia's own diversity.  He talked about,

10 quote:  Such as hundreds of years of racism and overt,

11 unconscious bias will not be fixed with a vaccine.

12 Instead, we must be part of a solution, and we must each

13 rededicate ourselves to the cure.

14          I think it's important to understand, so when

15 it came to hiring within Expedia, what did he understand

16 that to mean?  What was he going to be instructing his --

17 his company to be doing in response to that?  And not

18 just, again, in their publicly vetted, but in their

19 own -- you know, in their own internal documents, how did

20 they understand that.

21          He talks specifically in respect to hiring:  We

22 will require inclusive, equitable hiring practices.

23          Well, what does that mean?  I think we're

24 entitled to explore that since the diversity policies

25 that they put in place clearly made race and gender a

1  factor in hiring.

2         We may have a dispute about, she said this

3  funnel and what does that mean.  But at this stage in the

4  pleadings, we're entitled to explore the genesis of these

5  policies.  And if those policies are race -- are

6  intentionally focused on race -- and we would argue

7  illegally focused on race -- it doesn't matter in many

8  respects how they may have changed.  What matters is were

9  they intentional in trying to set up discriminatory

10 practices within Expedia.

11        And then, of course, we want to be able to

12 explore how that actually happened, given all of the

13 other evidence that we have that Mr. Kascsak was given

14 nothing but glowing reviews throughout the interview

15 process, was offered the job, and then had it put on

16 hold.  And we have very strong reason to believe it was

17 put on hold so that they could look at a more thorough

18 and diverse candidate pool, i.e., a candidate who was not

19 a white male.  That is illegal, and we're entitled to

20 discovery to demonstrate that.

21        And, if I may, there's -- well, this one I

22 don't know how helpful it's going to be because the print

23 is really small, but I have two documents I'd like to

24 hand up to the court.  These have been shared with

25 Plaintiff's [sic] counsel, but do -- Amy, do you want

1    another copy?

2          This one-page exhibit is simply -- is simply an

3    exhibit that we put together.  And, unfortunately, the

4    print is small to get it on one page, but it sort of

5    details the documents and the quotes in this case

6    compared to the evidence that they had in the *Langley v.*

7    *IBM* case and in another case, again, that dealt with

8    discovery into corporate-wide, company-wide discovery,

9    the *Walsh v. Doner* case, so that you have that for

10   comparison to see how the statements and things in this

11   case stack up and how in those cases four and five years

12   worth of discovery was permitted, which we're seeking

13   less than that.

14         And then the second document that I handed up

15   to you that I think is we believe helpful and relevant,

16   it takes the RFPs that are still at issue and it puts the

17   language of them and then it has Expedia's objections.

18   And then we've highlighted why we believe each of the

19   objections is problematic in a color-coded way to

20   understand why we have concerns about each of their

21   objections.

22         And I would note that Expedia continues to

23   refer to the, quote/unquote, relevant time period.

24   Nowhere in their document have they defined what that is.

25   So how are we to know what they did in terms of their

1  searches.  And, again, how do we evaluate it when all

2  they've said is "the relevant time period"?  We obviously

3  now know that they're cutting it off at February of 2023.

4  But we did not know that, of course, at the time.

5          And, frankly, it's hard to hear about the

6  purported burden to Expedia when we have been trying for

7  months to have these conversations.  I too wonder, even

8  if they don't believe they have an obligation, why they

9  don't think it is in their best interests to try to have

10  these conversations.

11          Ms. Dashiell suggested it was because I wasn't

12  involved in the Rule 26(f) conference.  I don't dispute

13  that.  I was not in the case at the time.  But when I got

14  involved in this case, I sent an email specifically

15  asking for the sorts of information we're talking about.

16  It was not this very burdensome -- their objection is to

17  the actual language of Interrogatory 22.  I tried to have

18  that conversation.  We tried to narrow it down.  We tried

19  to address their concerns.  They still refused to have

20  this conversation.

21          I think it's sort of inexplicable, because this

22  is why this is so burdensome, because there's been no

23  agreement.  And maybe if we'd had those discussions,

24  there wouldn't -- I wouldn't suggest we wouldn't be here

25  because there's always going to have been the dispute

1  over relevancy.  But there might be less -- less of a

2  dispute over what are we looking for and what kind of

3  documents are we seeking.

4         And the final point I would make is, with

5  respect to RFPs 20 and 21, they contend they've produced

6  everything and that we haven't explained what we wanted,

7  when -- and, again, I was not the counsel at the time.

8  But when they served their initial objections on

9  April 2nd, the very next day, Plaintiff's counsel sent

10  them a response.  She's calling it amended objections.

11  But, in my experience, it's what typically happens which

12  is saying, Look -- Look, Defendant, you've objected that

13  things are vague, you've objected that things are

14  overbroad.  Here's why we think your objections aren't

15  valid and here's how we're narrowing the construction to

16  try to address your concerns.

17         And those were -- and in those objections

18  explained very, very clearly what we're looking for here

19  are not your public documents, not your public diversity

20  reports.  We're looking for your nonpublic documents.

21  They have known this since April 3rd, but yet here we

22  are.  And, you know, again, I am willing to work with

23  them, but I'm not willing to forgo what I believe are the

24  relevant documents that my client is entitled to.

25         THE COURT:  Well, with respect to that last

1    part, the 20 and 21, so I hear Ms. Dashiell to say that,

2    well, are they seeking every little detail about every

3    applicant at that level of the organization?  And I don't

4    necessarily read hiring criteria and hiring guidance to

5    require that level of detail.  But is there any more

6    language we can use to cabin in what you mean by hiring

7    criteria and hiring guidance?

8         MS. MOSS:  I do think there is, Your Honor, and

9    we've attempted to have some of those conversations in

10   our meet and confer.  We're not looking for, necessarily,

11   every single applicant to a particular job.  We've

12   explained that part of what we're looking at is the

13   demographic data.

14        So we want to know, for example, were there

15   internal communications, discussions, directives within

16   Expedia focused on the fact that, at the leadership

17   level -- not just at the position that the plaintiff was

18   being considered for, but sort of across the board at

19   Expedia, were there conversations or discussions about

20   what we need to do to have more what they consider to be

21   more diverse individuals in those positions.

22        And that kind of communication is not going to

23   be necessarily in the formal job descriptions that

24   they're putting together.  I -- I would find it unlikely

25   that they're going to say we're looking for a, you know,

1  African American person to fill this.  They're going to

2  say -- that's not what that's going to be.  But are they

3  going to say, look, you know, are there discussions about

4  we need to do more, or however they might talk about it

5  internally I can only speculate at this point.

6           But we've explained that it's those sorts of

7  internal discussions, and we can certainly work with them

8  to try to narrow it.  Because, no, I'm not interested in,

9  you know, the broad scope of information that was

10 produced about the position that the plaintiff was being

11 considered for.  That obviously was a very specific

12 position.  It's more this comparator data and an

13 understanding about what were they doing in these other

14 areas.

15          And it's, again, not just limited to this one

16 position because, conversely, we understand that in the

17 tech level -- you know, on the tech side, they had a

18 different issue, which is they did have a lot of

19 minorities.  They just weren't apparently the minorities

20 they preferred because they were Asian.  So is there

21 discussion about that?

22          That is something I think is important for us

23 to discover, because then, circumstantially and

24 inferentially, a jury could conclude that that mind set

25 and that corporate thought process is what was brought to

1  bear in the ultimate decision to place the job offer that

2  was given to the plaintiff on hold as they interviewed

3  others.

4          MS. MOSS:  Thank you.

5          THE COURT:  Anything else?  Thank you.

6          Ms. Dashiell, did you have anything more?

7          MS. DASHIELL:  Just briefly, Your Honor.  I

8  would distinguish this case from *Langley* because that

9  involved a company-wide RIF, where this is a decision

10 regarding one person.  I think what's missing that was

11 present in Langley is a nexus between Peter Kern and this

12 decision.

13         Now, again, 2022 forward we're not going to

14 quibble with.  But I don't see, again, how the genesis of

15 those policies or general discussions about these

16 policies from these individuals that long ago has any

17 bearing on these issues.

18         With regard to this document that plaintiff

19 produced, I think it's covered by the advisory.  Our

20 initial objection is it doesn't include our responses, so

21 I think it's a little bit misleading.

22         And, finally, I would say, you know, there's

23 been a lot of discussion about why we're here and how

24 Expedia's actions caused us to be here.  You know, we're

25 here because it's clear the parties have a -- had and

1 have a fundamental disagreement on the scope of this

2 discovery and on their right to insert themselves into

3 our discovery process.  And that's why, and I appreciate

4 Your Honor, we're taking up the time of the Court.

5           And so I think, again, those issues in terms of

6 scope, especially in terms of the time period, will be

7 very helpful in resolving a number of these issues.  And

8 hopefully we will not have to come back to the Court

9 again.

10          THE COURT:  Okay.  Well, what I would like to

11 do is just take a -- at least a 10-minute break.  So it's

12 3:40 right now.  I think I'm prepared to rule on the

13 motion from the bench and state my ruling and the reasons

14 for it here on the record, and then I'll just have a

15 brief written order to kind of summarize that ruling.

16 But I want to organize my thoughts and my notes before I

17 just start blathering on here in the microphone.

18          So it will take at least 10 minutes for me to

19 do that.  And the reason I say it that way is so you know

20 you've got until 3:50.  But I may take longer, but I'm

21 not going to be out any sooner than 3:50.  Okay?

22          So, with that, thank you, and we'll see you-all

23 in a little bit.

24     (Recess from 3:40 to 4:02 p.m.)

25          THE COURT:  All right.  Thank you for indulging

1   that break.  Of course, it was more than 10 minutes.  But

2   by the time you go back and talk to the clerks and see

3   what they thought of all this and then kind of organize

4   your thoughts, it always takes more time than I expect,

5   but it was time well spent, and so I appreciate the

6   folks' patience as I took that break from our hearing.

7           And so at this time I'll announce my ruling.  I

8   guess I'm back to where I was when I had started this

9   hearing, which is, you know, mindful of 26(b)(1)'s

10  command that we balance relevance with proportionality.

11  While I appreciate, and I thought it was a well-made

12  argument about the importance of communications

13  surrounding the June 2020 action letter, I think in the

14  effort of refining the scope of the expanded discovery

15  that's going do be ordered today to that January 1st,

16  2022 cutoff I think strikes the right balance.

17          And so -- because, ultimately, certainly there

18  were these public pronouncements that were made earlier

19  than that time.  But I find that, in terms of

20  discoverability and communications that would be relevant

21  to the matters that might be raised in a dispositive

22  motion or ultimately in front of a jury, that it's going

23  to be the communications more recent in time that are

24  more germane to the hiring decision and company policies

25  that were in effect and being considered, both publicly

1  and behind closed doors, at Expedia at the time of

2  Mr. Kascsak's offer and then withdrawal of an offer in

3  April of 2023 and the months after.

4           So, with that, the caveat I'll offer here,

5  because there was, as the joint advisory sets out, some

6  of the RFPs, the language of those RFPs as set out in the

7  joint advisory, several of them say "as amended."  And

8  that's what I am -- my ruling here is on the RFPs as

9  amended, as reflected in the joint advisory that appears

10  at Docket 63.

11           So I'm going to go in order of the discovery

12  requests as they appear in that document.

13           On Interrogatory 22, the discovery on discovery

14  ROG, I am going to deny that without prejudice to its

15  being reasserted.  If after this next round of discovery

16  comes out, if there's still legitimate concerns about

17  Defendant's ESI protocol, I think we'll know more about

18  that after the ruling today has been complied with.

19           As I had said before, I suspect some of

20  plaintiff's concerns about not receiving documents they

21  expected to receive were more a reflection of the

22  relevance objections and burdensome objections that

23  Defendants made and less a function of an inadequate ESI

24  protocol.  But I also don't want for this ruling to

25  preclude Plaintiff from asserting this, if it is still an

1    ongoing concern after receiving this next round of

2    production.

3         And this is as good a time to note as any, I

4    appreciate -- I think what's clear to me is both sides

5    are conducting themselves in litigation in good faith,

6    and I don't doubt that one bit.  And I so appreciate -- I

7    know there's been lots of meets and confers and

8    back-and-forth.  So I have no concerns about how either

9    side is conducting themselves in this litigation so far,

10   as least from what I've seen.

11        RFP 2 I'm granting in part, limited to

12   communications from January 1st, 2022 on.

13        Same as to RFP 3.

14        RFP 9, I'm granting that RFP, to the extent

15   that it's not already been -- there are still documents

16   that are responsive to this that haven't already been

17   produced, I'm granting the motion to compel on RFP 9.

18        RFP 10 I'm granting in part, limited to

19   communications going back to January 1st, 2022.

20        There was a question here with respect to -- I

21   know Ms. Dashiell had raised a question about confusion

22   regarding the phrase regarding "any of the information."

23   In this and there's a couple of other places where I'm

24   going to order the parties to confer and see if they can

25   mutually agree on scope of that language.  I mean, we can

1  try and hash it out here in the courtroom, or if you-all

2  think you can probably come up with something on your

3  own, I'll leave it to you.  Or if you try and you can't,

4  then I'm also open to considering even informal

5  resolution of those kinds of disputes.

6          Any thoughts on that?  And let me go ahead and

7  set out the ones where I feel like we need a little bit

8  more discussion.

9          This one, the confusion regarding "regarding

10  any of information in RFP 10."

11          RFP 11, about definition of, quote, hiring

12  criteria, hiring guidance, or the demographic

13  composition, it felt like there was some confusion on how

14  broad that is.

15          And then on RFPs 20 and 21 -- and I'll come

16  back.  I've got other limitations, but I want to flag the

17  parts where I feel like there may need to be some

18  discussion about what some of this language means.

19          I know Defendants in the joint advisory said

20  they've already complied with this, but they excluded,

21  quote, nondecision-makers.  So I think there may need to

22  be some discussion between the parties on who the

23  appropriate custodians are on RFPs 20 and 21.

24          So I guess let me kind of break away from my

25  chronological ruling on these RFPs to ask -- pose the

1  question:  For those specific matters, do you-all want to

2  confer on those and, if you can't reach an agreement,

3  then we can -- I can informally resolve it either by

4  email or a phone call?

5          MS. DASHIELL:  That would be my preference.

6          MS. MOSS:  Yes.  Let's not waste your time.  So

7  we'll try as hard as we can to reach an agreement and not

8  bother you.

9          THE COURT:  Oh.  And that's fine.  I mean,

10  that's why I'm here is to handle -- you know, rule on

11  those things.

12          Okay.  So I'm going to leave it to you-all.

13  But to save you the time and expense of, like, another

14  round of motion practice on something that we've already

15  dealt with, I will -- I guess do you have Ms. Wallace's

16  email address?

17          THE CLERK:  I can give it to them.

18          THE COURT:  Would you -- Ms. Wallace, would you

19  mind being the recipient of such an email?  Maybe you

20  won't get one.  But if there is a need for an informal

21  resolution, then let Ms. Wallace know and we'll get

22  something on the calendar or I can respond by email.

23          Okay.  So back to RFP 10.  Granting in part,

24  limited to responsive documents dating back to

25  January 1st, 2022.

1            RFP 11 I think by its terms is already limited

2    to January 1st, 2022, so I'm granting that.  And this is

3    the one where, again, I would like for you-all to confer

4    about the definition of hiring criteria, et cetera.

5            RFP 19 I understand to be moot.

6            And then RFP 20 and -- RFPs 20 and 21, granted

7    in part, limited to January 1st, 2022, subject to the

8    parties' discussion regarding custodians to ensure that

9    the right folks are being searched.

10           And the deadline for producing responsive,

11   nonprivileged documents will be 45 days from today,

12   whatever date that is.  I have a date calculator here.

13           And that's a Sunday, of course.  It says

14   Sunday, November 17th.  So we'll say Monday,

15   November 18th, will be the deadline.  Of course, it's

16   still within the discovery period.  So if you-all need --

17   if you need more time, unless there's a dispute, you

18   don't need to raise it with me.

19           Okay.  Well, that I think disposes of all the

20   matters that were teed up in this motion.  Is there

21   anything else for us to discuss while we're all here

22   together?

23           MS. MOSS:  Your Honor, just quickly.  With

24   these documents being due on November 18th, that

25   obviously is going to give us only a very short period of

1  time then to review the documents and do depositions.  So

2  I can -- I can forecast right now that I believe we're

3  going to need to request that the discovery deadline be

4  pushed out.  But my suggestion would be that this be

5  another item that we confer about and maybe make a

6  hopefully joint proposal to the Court about.

7           THE COURT:  Yes.  So the parties can agree

8  between themselves.  It's Judge Pitman's practice to let

9  the parties agree on extending discovery deadlines

10  without need for leave from the court.

11           MS. MOSS:  Okay.

12           THE COURT:  What does require leave of court is

13  moving the dispositive motion deadline.

14           MS. MOSS:  The dispositive, okay.

15           THE COURT:  And so if it turns out that you

16  need to do that, which I know that falls pretty closely

17  on the heels -- in your scheduling order it's 30 days it

18  looked like -- then you would need to get leave.

19           MS. MOSS:  Okay.  And, obviously, there is a

20  little concern there, but we can discuss.

21           THE COURT:  Okay.  Anything else?

22       (No audible response)

23           THE COURT:  No.  All right.  Thank you.

24       (Proceedings concluded at 4:14 p.m.)

25

1                    **REPORTER'S CERTIFICATE**

2        I, Arlinda Rodriguez, do hereby certify that the foregoing

3   was transcribed from an electronic recording made at the time

4   of the aforesaid proceedings and is a correct transcript, to

5   the best of my ability, made from the proceedings in the

6   above-entitled matter, and that the transcript fees and format

7   comply with those prescribed by the Court and Judicial

8   Conference of the United States.

9

10  /S/ Arlinda Rodriguez                    October 31, 2024

11  ARLINDA RODRIGUEZ                        DATE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ARLINDA L. RODRIGUEZ, OFFICIAL COURT REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)